STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION; PUBLIC STAFF-NORTH CAROLINA UTILITIES COMMISSION, INTERVENOR; CAROLINA UTILITY CUSTOMERS ASSOCIATION, INC., INTERVENOR; DEPARTMENT OF DEFENSE OF THE UNITED STATES, INTERVENOR; CONSERVATION COUNCIL OF NORTH CAROLINA, INTERVENOR; CAROLINA INDUSTRIAL GROUP FOR FAIR UTILITY RATES—FEDERAL PAPER BOARD COMPANY, INC.; HURON CHEMICALS OF AMERICA, INC.; LCP CHEMICALS AND PLASTICS, INC.; MONSANTO COMPANY; UNION CARBIDE CORPORATION; CLARK EQUIPMENT COMPANY; CORNING GLASS WORKS; DIAMOND SHAMROCK CHEMICAL COMPANY; MASONITE CORPORATION; NORTH CAROLINA PHOSPHATE CORPORATION; OUTBOARD MARINE CORPORATION; FIRESTONE TIRE AND RUBBER COMPANY; WEYERHAUSER COMPANY, INTERVENORS; KUDZU ALLIANCE, INTERVENOR; AND NORTH CAROLINA EASTERN MUNICIPAL POWER AGENCY, INTERVENOR, APPELLEES v. LACY H. THORNBURG, ATTORNEY GENERAL, INTERVENOR, APPELLANT; AND CAROLINA POWER & LIGHT COMPANY, APPLICANT, CROSS-APPELLANT

No. 278A85

(Filed 2 April 1986)

**1. Utilities Commission § 56— utility rates—burden of proving impropriety**

Rates fixed by the Utilities Commission are deemed *prima facie* just and reasonable, and the party attacking the rates established by the Commission bears the burden of proving that they are improper. N.C.G.S. § 62-94(e).

**2. Utilities Commission § 56— review of utility rate case—whole record test**

The order of the Utilities Commission in a utility rate case will not be disturbed if, upon consideration of the entire record, the appellate court finds the decision is not affected by error of law and the facts found by the Commission are supported by competent, material, and substantial evidence, taking into account any contradictory evidence or evidence from which conflicting inferences could be drawn.

**3. Utilities Commission § 56— rate case—minimal consideration of competent evidence**

A summary disposition which indicates that the Utilities Commission accorded only minimal consideration to competent evidence in a rate case constitutes error at law and is correctable on appeal.

**4. Utilities Commission § 56— rate case—presumption of consideration of competent evidence**

It will be presumed that the Utilities Commission gave proper consideration to all competent evidence presented in a rate case absent an express statement by the Commission to the contrary, some record evidence to the contrary, or a summary disposition which indicates to the contrary. Therefore, the Commission's finding that the inclusion of additional construction work in

progress in the rate base of a power company was in the public interest was proper where no such statement, record evidence or summary disposition appears in the case and there was competent, material and substantial evidence supporting the finding.

**5. Electricity § 3; Utilities Commission § 34— power company—inclusion of CWIP in rate base—financial stability standard**

The inclusion of construction work in progress in the rate base of a public utility is "necessary to the financial stability of the utility" within the meaning of N.C.G.S. § 62-133(b)(1) if it is determined that the financial strength of the company will be significantly damaged if construction work in progress is not included in the rate base.

**6. Electricity § 3; Utilities Commission § 34— power company—inclusion of CWIP in rate base—financial stability standard**

The "financial stability" requirement of N.C.G.S. § 62-133(b)(1) means that construction work in progress may be included in a utility's rate base to the extent the Commission determines that the inclusion is necessary to allow the utility to maintain a generally good overall financial status. The "financial stability" standard does not require a finding that the inclusion is necessary to the financial survival of the company.

**7. Electricity § 3; Utilities Commission § 34— inclusion of CWIP in rate base—effect on bond rating—financial stability standard**

Evidence that a power company's bond rating was in jeopardy of falling from an A rating to a BAA rating and that the inclusion of additional construction work in progress in the company's rate base was necessary to stabilize the company at its A rating level supported a finding by the Utilities Commission that the inclusion of the additional construction work in progress was necessary to the company's financial stability.

**8. Electricity § 3; Utilities Commission § 38— power company rates—normalization of nuclear capacity factor**

The Utilities Commission did not err in "normalizing" the nuclear capacity factor component of a power company's test-period generation mix in ascertaining the company's cost of fuel by utilizing the national average capacity factor for each type of nuclear plant computed by the North American Electric Reliability Council for the period 1972-81 and adjusting these national averages downward to take into account planned outages at two of the power company's nuclear plants.

**9. Electricity § 3; Utilities Commission § 56— refund of deferred fuel account**

The Utilities Commission did not err in ordering a power company to refund to its customers the funds in the deferred fuel account which the Commission ordered the company to establish in a prior general rate case. However, the Commission did err by ordering a deduction from the company's annual rate increase in the amount of the refund rather than ordering a lump-sum refund (*i.e.*, one-time rate reduction) or a rate reduction over a period of time.

State ex rel. Utilities Comm. v. Thornburg, Atty. Gen.

APPEAL under N.C.G.S. § 7A-29(b) by the Attorney General and cross-appeal pursuant to N.C.G.S. § 62-90(a) by Carolina Power & Light Company from an order of the North Carolina Utilities Commission entered in Docket No. E-2, Sub 481. Heard in the Supreme Court 20 November 1985.

*Robert P. Gruber, Executive Director, by Antoinette R. Wike, Chief Counsel, for intervenor-appellee Public Staff-North Carolina Utilities Commission.*

*Lacy H. Thornburg, Attorney General, by Steven F. Bryant, Assistant Attorney General, and Karen E. Long, Assistant Attorney General, for intervenor-appellant Attorney General.*

*Richard E. Jones, Vice President and Senior Counsel, for applicant-cross-appellant Carolina Power & Light Company.*

MEYER, Justice.

On 21 February 1984, Carolina Power & Light Company (hereinafter "CP&L") filed an application with the North Carolina Utilities Commission (hereinafter "Commission") for an increase in its rates for electric service to its retail customers in North Carolina so as to increase annual revenue by approximately $151.6 million, or 12.6%. In the application, CP&L proposed to make the rate increase effective 22 March 1984. In an order issued 21 March 1984, the Commission determined that the application constituted a general rate case and suspended the proposed rate increase for a period of up to 270 days. On 29 March 1984, the Commission issued an order scheduling public hearings on the proposed rate increase and establishing the test period as the twelve-month period ending 30 September 1983. The Public Staff-North Carolina Utilities Commission (hereinafter "the Public Staff") filed a notice of intervention, and the Commission permitted various parties to intervene in the proceeding. Public hearings were held by the Commission in various areas of the state in June, July, and August 1984.

On 21 September 1984, the three-member Commission panel which heard the evidence issued an order which granted CP&L an increase in gross annual revenues of $64,339,000 from its North Carolina retail operations. However, due to the fact that two of the members of the panel dissented from different portions

of the order, the decision constituted only a recommended order pursuant to N.C.G.S. § 62-60.1(c). Subsequently, various parties requested a review by the full Commission.

Additional hearings were held before the full Commission in November 1984. On 20 November 1984, the Commission issued its final order which affirmed the $64,339,000 rate increase that had been recommended by the panel. The Attorney General appealed, and CP&L cross-appealed.

I.

Intervenor Attorney General argues that the Commission erred in calculating the amount of construction work in progress (hereinafter "CWIP") which was to be included in CP&L's rate base. CP&L requested the inclusion of $695,275,923 of CWIP in its rate base. This entire amount is attributable to Unit One of CP&L's Shearon Harris Nuclear Power Plant and constituted an increase of approximately $155,500,000 above the CWIP which the Commission included in the company's rate base in its 1983 general rate case, Docket No. E-2, Sub 461.

The Public Staff, however, contended that the amount of CWIP which had been included in CP&L's rate base was $496,597,912.[1] The Public Staff recommended that the Commission continue to allow CP&L to include this amount of CWIP in its rate base.

In its recommended order, the hearing panel found that $692,604,000 of CWIP should be included in CP&L's rate base. Subsequent to the issuance of the panel's recommended order, this Court issued its opinion in *Utilities Comm. v. Conservation Council,* 312 N.C. 59, 320 S.E. 2d 679 (1984), which held that it was

---

1. According to CP&L, the disagreement between it and the Public Staff regarding the amount of CWIP included in the rate base results from the utilization of different methods for allocating expenses between North Carolina and other jurisdictions. According to CP&L, in the 1983 general rate case, the portion of generation attributable to the North Carolina Eastern Municipal Power Agency was not separately allocated. Costs and offsetting revenues were spread across CP&L's other classes of customers. However, in a 1984 general rate case, the Power Agency's share was treated as a separate class of customers. This caused the allocation factor for North Carolina retail customers to be reduced. As a result, a part of CWIP was allocated to the separate Power Agency class, leaving $496,597,912 of CWIP in the North Carolina retail rate base.

error to include CWIP in the rate base to the extent that it was comprised of allowance for funds used during construction accrued subsequent to 1 July 1979 on construction work which occurred prior to 1 July 1979. Therefore, at the November hearings before the full Commission, CP&L adjusted the amount of CWIP which it was requesting to be included in the rate base so as to exclude the expenses held to be ineligible for rate base inclusion in the *Conservation Council* case. The adjusted request was $675,306,000. The Public Staff continued to adhere to its position that $496,597,912 was the proper amount of CWIP which should be included in CP&L's rate base.

In its final order, the Commission found that $663,167,000 of CWIP should be included in CP&L's rate base. The Commission stated that the inclusion of this amount of CWIP was in the public interest and was necessary to the financial stability of CP&L.

**[1-3]** Before examining the Attorney General's contentions, we deem it wise to take note of certain fundamental principles. The Commission, not the courts, has been given the authority to regulate the rates of public utilities. N.C.G.S. § 62-2 (1982 and Cum. Supp. 1985). The rates established by the Commission must, however, be fair to both the utility and the customer. N.C.G.S. § 62-133(a) (1982 and Cum. Supp. 1985). Rates fixed by the Commission are deemed prima facie just and reasonable. N.C.G.S. § 62-94(e) (1982 and Cum. Supp. 1985). The party attacking the rates established by the Commission bears the burden of proving that they are improper. *Utilities Comm. v. Duke Power Co.*, 305 N.C. 1, 287 S.E. 2d 786 (1982). The order of the Commission will not be disturbed if, upon consideration of the entire record, we find the decision is not affected by error of law and the facts found by the Commission are supported by competent, material, and substantial evidence, taking into account any contradictory evidence or evidence from which conflicting inferences could be drawn. *Id.* Naturally, an appellant may show on appeal that the order is not supported by competent, material, and substantial evidence. *Id.; Utilities Comm. v. Edmisten*, 291 N.C. 424, 230 S.E. 2d 647 (1976). The credibility of testimony and the weight to be accorded it are matters to be determined by the Commission. *Utilities Comm. v. City of Durham*, 282 N.C. 308, 193 S.E. 2d 95 (1972). However, a summary disposition which indicates that the

Commission accorded only minimal consideration to competent evidence constitutes error at law and is correctable on appeal. *Utilities Comm. v. Edmisten,* 299 N.C. 432, 263 S.E. 2d 583 (1980).

N.C.G.S. § 62-133(b)(1) provides that, in fixing the rates for any public utility, the Commission must:

> Ascertain the reasonable original cost of the public utility's property used and useful, or to be used and useful within a reasonable time after the test period, in providing the service rendered to the public within the State, less that portion of the cost which has been consumed by previous use recovered by depreciation expense plus the reasonable original cost of investment in plant under construction (construction work in progress). In ascertaining the cost of the public utility's property, construction work in progress as of the effective date of this subsection shall be excluded until such plant comes into service but reasonable and prudent expenditures for construction work in progress after the effective date of this subsection may be included, to the extent the Commission considers such inclusion in the public interest and necessary to the financial stability of the utility in question, subject to the provisions of subparagraph (b)(4a) of this section.

This provision clearly commits to the discretion of the Commission the determination of what amount of CWIP, if any, to include in the utility's rate base. This discretion is tempered, however, by the statute's requirement that the expenditures be reasonable and prudent and that the Commission find that the inclusion is "in the public interest and necessary to the financial stability of the utility in question." The Attorney General contends that the Commission erred in finding that inclusion of the additional CWIP in CP&L's rate base was in the public interest and was necessary to the financial stability of the company, and therefore the Commission exceeded its statutory authority in setting CP&L's rates. We do not agree.

With regard to the finding that the inclusion of the additional CWIP was in the public interest, the final order recited several factors which the Commission had considered. These were: (1) that the inclusion in the rate base would result in lower revenue requirements on a net present value basis through the year 2000; (2) that the inclusion would result in a gradual increase in rates

over the period of construction rather than all at once when the plant goes into service; (3) that the inclusion is a lower cost method of improving CP&L's cash flow, interest coverage, and other key financial indicators than are available alternative policies; (4) that the inclusion would give ratepayers accurate pricing signals regarding the cost of electricity necessary to make decisions regarding home insulation, appliances, and other energy-sensitive investments; (5) that migration studies have shown that most of CP&L's present ratepayers will also be future ratepayers; and (6) that assurance of adequate service in the future attracts industry and jobs and bolsters the economy in the service area. A review of the record reveals that CP&L presented competent, material, and substantial evidence in support of these factors which the Commission found established the "public interest requirement" for CWIP inclusion.

The Attorney General, however, argues that the Commission failed to consider evidence that was presented which tended to show that the CWIP inclusion was not in the public interest. In particular, the Attorney General contends that the Commission completely ignored or at best gave only minimal consideration to the testimony of a Public Staff financial analyst to the effect that the inclusion of additional CWIP would reduce CP&L's incentive to complete the Shearon Harris facility as soon as possible.

[4]	It is clear that if the Commission gave only minimal consideration to competent evidence, that would constitute error at law and would be correctable on appeal. *Utilities Comm. v. Edmisten*, 299 N.C. 432, 263 S.E. 2d 583 (where record evidence so indicates); *Utilities Comm. v. Gas Co.*, 254 N.C. 536, 119 S.E. 2d 469 (1961) (where order of Commission so indicated); *see also Utilities Comm. v. Thornburg*, 314 N.C. 509, 334 S.E. 2d 772 (1985). Although the order of the Commission in the case at bar does not set out that portion of the analyst's testimony discussing the effect of inclusion of CWIP on CP&L's incentive to complete the plant as soon as possible, this cannot be said to be an indication that the Commission failed to accord the evidence the proper amount of consideration. The evidence in this case consisted of thirty-one volumes of testimony, three volumes of exhibits, and four volumes of CP&L financial information. Obviously, it would be impossible for the final order to include a recitation of all of the evidence which factored into the Commission's decision. In

the absence of an express statement by the Commission to the contrary, some record evidence to the contrary, or a summary disposition which indicates to the contrary, we must presume that the Commission gave proper consideration to all competent evidence presented. Since no such statement, record evidence, or summary disposition appears in this case and there was competent, material, and substantial evidence supporting the finding that the inclusion of the additional CWIP was in the public interest, we conclude that this finding was properly made.

With regard to the Attorney General's contention that the inclusion of the additional CWIP was not necessary to CP&L's financial stability, our first task is to ascertain the meaning of the phrase "necessary to the financial stability of the utility." We begin our analysis by noting that the term "financial stability" is not defined in the Public Utilities Act, N.C.G.S. § 62-1, *et seq.* We must therefore rely on established principles of statutory construction to interpret the phrase.

The cardinal principle of statutory construction is that the intent of the legislature is controlling. In determining this intent, the courts should consider the statute's language, spirit, and goals. *Utilities Comm. v. Public Staff,* 309 N.C. 195, 306 S.E. 2d 435 (1983). When the language of a statute is clear and unambiguous, it must be accorded its clear meaning and may not be evaded. by a court under the pretext of construction. *Utilities Comm. v. Edmisten,* 291 N.C. 451, 232 S.E. 2d 184 (1977). Furthermore, while the interpretation by an agency responsible for the administration of a legislative act may and should be considered by a court called upon to construe statutory language, the agency interpretation is not controlling. *Faizan v. Insurance Co.,* 254 N.C. 47, 118 S.E. 2d 303 (1961).

[5] The Commission has stated that the financial stability test can be met only if it is determined that "the financial strength of the company will be significantly damaged if CWIP is not included in the rate base." *Re Continental Telephone Co. of North Carolina,* 56 P.U.R. 4th 687, 695 (1983). We believe that this is an entirely proper interpretation to place upon the statutory language. However, we must still ascertain what constitutes significant damage to the utility's financial strength.

Regulatory agencies in several other states have said that CWIP is to be included in the rate base to the extent necessary to provide and maintain the utility's "financial integrity." *E.g., Re Tampa Electric Co.,* 49 P.U.R. 4th 547 (1982); *Re New York State Electric & Gas Corp.,* 44 P.U.R. 4th 449 (1981); *Re City of Burlington Electric Light Dept.,* 43 P.U.R. 4th 117 (1981). This "financial integrity" standard can be traced to *Power Comm. v. Hope Gas Co.,* 320 U.S. 591, 88 L.Ed. 333 (1944). In that case, the United States Supreme Court was required to construe the ratemaking process under the Natural Gas Act of 1938. The Court stated that the return to the equity owners "should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." *Id.* at 603, 88 L.Ed. at 345. Although the case did not involve the issue of CWIP, the Court's statement regarding the proper rate of return is relevant since CWIP can constitute a significant portion of the rate base. We feel that the "financial integrity" standard utilized by several other state regulatory agencies is comparable or equivalent to the "financial stability" standard contained in N.C.G.S. § 62-133(b)(1), and we will examine some of those agency decisions in determining the construction to place on our statutory language.

In construing the "financial integrity" standard, the regulatory agencies have relied on an analysis of various economic and financial indicators. Among those indicators are the amount of the utility's cash flow, its bond coverage ratios, and the percentage of earnings comprised of allowance for funds used during construction (AFUDC). *See, e.g., Re Tampa Electric Co.,* 49 P.U.R. 4th 547. The bond coverage ratio is the ratio of net earnings available for interest payments to the amount of bond interest payable. *See Re El Paso Electric Co.,* 38 P.U.R. 4th 289 (1980). This ratio, along with other factors such as CWIP as a percentage of net plant, AFUDC as a percentage of net income, and the company's common equity ratio, determines the company's bond rating. Bond ratings are important for several reasons. The ratings are used by investors in determining the quality of the investment. They are also utilized in ascertaining the breadth of the market, since some large institutional investors are prohibited from investing in low grade bonds. The ratings also partially determine the cost of new debt and have an indirect impact on the status of the utility's common stock. C. Phillips, *The Regulation of Public Utilities—*

*Theory and Practice* 218 n. 80 (1984). Investment quality securities are those having ratings of AAA, AA, A, or BAA (also known as BBB). 1 A. Priest, *Principles of Public Utility Regulation—Theory and Application* 463 (1969).

Several regulatory agencies employing the "financial integrity" standard have said that CWIP is to be included to the extent necessary to maintain a utility's investment grade bond rating. *E.g., Re Tampa Electric Co.*, 49 P.U.R. 4th 547 (allowed CWIP to the extent necessary to permit company to maintain AA rating); *Re Central Hudson Gas & Electric Corp.*, 58 P.U.R. 4th 509 (1984) (allowed CWIP to the extent necessary to permit company to maintain A rating). Other regulatory agencies, while not expressly articulating the "financial integrity" standard, have appeared to allow the inclusion of CWIP where necessary to assist the utility in maintaining its then-existing investment grade bond rating. *See, e.g., Re El Paso Electric Co.*, 38 P.U.R. 4th 289 (allowed CWIP to extent necessary to maintain split AA/A rating); *Re Utah Power & Light Co.*, 30 P.U.R. 4th 197 (1979) (allowed CWIP to extent necessary to maintain AA rating).

[6] This focus on the "maintenance" of a utility's investment grade bond rating seems well fitted to our statutory command that the inclusion be necessary to the "financial stability" of the company. It would also seem to include those situations where the inclusion was necessary to permit a utility to upgrade its investment bond rating from noninvestment grade to investment grade or to shore-up a rating where a reduction is a substantial threat. Nevertheless, the Attorney General appears to implicitly argue that the financial stability requirement be construed as requiring a finding that the inclusion is necessary to the financial *survival* of the company. We decline to place such a Draconian construction on the statute. We do not believe that the General Assembly intended to require a utility to travel to the brink of financial ruin before being entitled to include CWIP in its rate base. Our conclusion is supported in part by N.C.G.S. § 62-2(3), which states the public policy of the State to promote adequate, reliable, and economical utility service to the residents of North Carolina, and N.C.G.S. § 62-2(4a), which states the public policy of the State to assure that facilities necessary to meet future growth can be financed by the utilities on terms that are reasonable and fair to

both the customers and existing investors of the utilities. Utilities faced with economic collapse would be hard pressed to provide adequate, reliable, and economical services to the public and to plan for and meet the increased demands occasioned by future growth. Furthermore, we note that the word "stability" is defined as "the strength to stand or endure without alteration of position or without material change." *Webster's Third New International Dictionary* 2217 (1976). We interpret the "financial stability requirement as meaning that CWIP may be included in the utility's rate base to the extent the Commission determines that the inclusion is necessary to allow the utility to maintain a generally good overall financial status.

In the present case, the Commission found that the inclusion of additional CWIP was necessary to the financial stability of CP&L based in part on a finding that its inclusion was necessary to improve the company's financial indicators. CP&L had an A bond rating at the time of the hearings. CP&L witness Spann testified concerning the five common indicators used for determining a utility's bond rating. He stated that CP&L's bond coverage ratio was 2.4. This compared with 2.71 for the average A-rated utility and 2.04 for the average BAA-rated utility. The company's CWIP as a percentage of net plant was 38.3%, compared with 24.6% for the average A-rated utility and 34.68% for the average BAA-rated utility. Spann also testified that CP&L's AFUDC as a percentage of net income was 59.5%, compared with 39% for the average A-rated utility and 61.33% for the average BAA-rated utility. He also testified that CP&L's internal generation of construction expenses was 38%, compared with 57% for the average A-rated utility and 52% for the average BAA-rated utility. CP&L's common equity ratio was 40.4%, which was better than the average A-rated utility's 39%.

Therefore, of the five major indicators, two of CP&L's indicators were below those of the average BAA-rated utility, one was closer to the average BAA than the average A, one was approximately equidistant between the average BAA and the average A, and one was better than the average A-rated utility. This and other evidence clearly tended to show that CP&L's financial indicators were closer to those of a BAA-rated utility than an A-rated utility. CP&L witnesses further testified that the company was in danger of having its bonds downgraded to a BAA

rating and that this risk would be greatly increased if additional CWIP was not included in the rate base. There was testimony to the effect that if CP&L's bonds were downgraded to BAA, the cost of the Shearon Harris plant would be increased due to the increased financing costs. There was also opinion testimony offered by CP&L witnesses that a BAA-rated utility is not "financially stable."

[7]  We conclude that this and other evidence amply supports the Commission's finding that the inclusion of the additional CWIP was necessary to CP&L's financial stability. There was substantial, competent, and material evidence that CP&L's bond rating was in jeopardy of falling from an A rating to a BAA rating and that the inclusion of the additional CWIP was necessary to "stabilize" the company at its A rating level.

The Attorney General notes that a Public Staff financial analyst testified that CP&L was financially stable and that the inclusion of additional CWIP was not necessary to the financial stability of the company. Furthermore, at the November hearing before the full Commission, the witness testified that CP&L's financial indicators had improved since the initial hearings were closed. This testimony was set out in the order and there is no indication that the Commission failed to accord this evidence proper consideration. Also, CP&L presented testimony to the effect that the improvement in its financial indicators since the initial hearings were closed was due to a temporary increase in sales and could not be expected to continue. As noted above, CP&L presented substantial evidence that the company was not financially stable and that the inclusion of additional CWIP was necessary to enable it to achieve financial stability.

We acknowledge that the evidence concerning the necessity of the inclusion of the additional CWIP in CP&L's rate base was conflicting. However, it is the Commission and not this Court that determines the weight and credibility to be accorded the evidence. The Commission weighed the evidence and concluded that the inclusion of additional CWIP was necessary to the company's financial. stability. This finding was supported by competent, substantial, and material evidence. Furthermore, there is no indication that the Commission ignored or gave minimal consideration to any evidence tending to show that the inclusion was not

necessary to CP&L's financial stability. We conclude that the Commission did not err in finding that the inclusion of the additional CWIP was necessary to CP&L's financial stability.

We hold that the Commission did not exceed its statutory authority in including the additional CWIP in CP&L's rate base, as the evidence clearly supports the Commission's finding that the inclusion was in the public interest and was necessary to the financial stability of the company.

II.

[8] On its cross-appeal, CP&L initially contends that the Commission erred in ascertaining the company's fuel costs. Specifically, CP&L argues that the Commission erred in "normalizing" the nuclear capacity factor component of CP&L's test-period generation mix. We conclude that the Commission did not err in calculating CP&L's fuel costs.

In order to address this issue, it is necessary to first examine the process by which the Commission calculated CP&L's cost of fuel. As the Commission noted in its order, this process basically involves three steps. Initially, the reasonable annual level of power generation in terms of kilowatt-hours (hereinafter "kWh") is determined. Second, the generation mix necessary to produce the power output calculated in the first step is determined. Basically, this involves a determination of the level of annual generation that would be produced by the four types of energy sources available to the company—coal, nuclear, oil, and hydroelectric. Additionally, the average level of energy purchases from and sales to other electric producers are included as a part of the generation mix calculation. Finally, a determination is made as to the reasonable cost per kWh to be attributed to each component of the generation mix. The costs are then multiplied by the number of kWh produced by each component of the generation mix in order to derive a total annual fuel cost.

The specific generation mix that is utilized in deriving the cost of fuel is very important. There is a wide variation in the cost associated with the various components of the generation mix. For example, there was testimony that the fuel cost involved in generating one kWh using oil was ten to fourteen cents, using coal was two cents, and using nuclear generation was one-half

cent. Therefore, the more oil generation which is included in the generation mix, the higher CP&L's cost of fuel. Conversely, the more nuclear generation included in the generation mix, the lower the company's cost of fuel.

CP&L witness Nevil testified that the company's fuel cost was 1.701 cents per kWh. This was based in part on his determination that CP&L's actual test-year system nuclear capacity factor was 45.17%.[2] This figure was a composite of the actual test-year capacity factors of CP&L's three nuclear generating units, Brunswick No. 1, Brunswick No. 2, and Robinson No. 2, appropriately weighed by the generating capacity of each unit.

Public Staff witness Lam testified regarding fuel cost. He recommended that CP&L's fuel cost be set at 1.582 cents per kWh. This calculation was based in part on a 53.4% system nuclear capacity factor. Lam testified that he felt CP&L's test-year nuclear performance (i.e., capacity factor) was lower than that which should reasonably be expected. He therefore "normalized" CP&L's system nuclear capacity factor for each type of nuclear plant,[3] as reported in the latest North American Electric Reliability Council report. These figures were further adjusted to take into account outages at Robinson No. 2 and Brunswick No. 2 which were certain to occur during the period the rates might be in effect.

The Commission concluded that CP&L's test-year 45% system nuclear capacity was abnormally low and not reasonably representative of the system capacity factor which the company could reasonably expect to experience in the future. The Commission went on to conclude that the "normalized generation mix" should reflect a 53.4% system nuclear capacity factor. Based on this and other evidence, the Commission held that CP&L's appropriate fuel factor was 1.582 cents per kWh.

---

2. capacity factor $= \dfrac{\text{net generation}}{\text{plant capacity x hours in a year}}$

3. Robinson No. 2 is a "pressurized water reactor." Brunswick No. 1 and No. 2 are "boiling water reactors." According to the North American Electric Reliability Council data, the average capacity factor for a "pressurized water reactor" is 62.7%, and the average capacity factor for a "boiling water reactor" is 60%.

CP&L argues that the Commission erred in calculating its fuel costs because the Commission's "normalization" of its system nuclear capacity factor was improper. Before addressing the Company's various arguments concerning this question, we deem it necessary to discuss the issue of normalization.

N.C.G.S. § 62-133 sets out the method by which rates are to be set. One factor which must be taken into consideration by the Commission in setting rates is the utility's reasonable operating expenses. N.C.G.S. § 62-133(b)(3) (1982 and 1985 Cum. Supp.). N.C.G.S. § 62-133(c) provides:

> The original cost of the public utility's property, including its construction work in progress, shall be determined as of the end of the test period used in the hearing and the probable future revenues and expenses shall be based on the plant and equipment in operation at that time. The test period shall consist of 12 months' historical operating experience prior to the date the rates are proposed to become effective, but the Commission shall consider such relevant, material and competent evidence as may be offered by any party to the proceeding tending to show actual changes in costs, revenues or the cost of the public utility's property used and useful, or to be used and useful within a reasonable time after the test period, in providing the service rendered to the public within this State, including its construction work in progress, which is based upon circumstances and events occurring up to the time the hearing is closed.

We have previously held that N.C.G.S. § 62-133 requires the Commission "to adjust test period data to reflect abnormalities which had a probable impact on the utility's revenues and *expenses* during the test period." *Utilities Comm. v. Carolina Utilities Customers Association,* 314 N.C. 171, 189, 333 S.E. 2d 259, 270 (1985) (emphasis added). This allows for a reasonably accurate estimate of what may be anticipated in the future. However, no *pro forma* adjustment is to be made unless the Commission finds that an abnormality having a probable impact on the utility's revenues and expenses existed during the test period. Whether such an abnormality existed is a question of fact to be determined by the Commission, and its finding is conclusive on appeal if supported by competent, material, and substantial

evidence. *Utilities Comm. v. Carolina Utilities Customers Association*, 314 N.C. 171, 333 S.E. 2d 259. Since fuel costs comprise a large portion of a utility's expenses, the statutory mandate to normalize test period data includes a requirement that the Commission adjust the test period fuel costs for any abnormalities established by competent, material, and substantial evidence. Since the system nuclear capacity factor directly impacts upon the generation mix, which in turn affects fuel costs, any abnormality in the system nuclear capacity which is shown to have existed during the test year must be adjusted.

CP&L initially contends that the Commission erred in concluding that the company's test-year system nuclear capacity factor was abnormally low. The company argues that this finding was arbitrary and capricious and is not supported by the record. We do not agree.

CP&L witness Howe testified that Brunswick No. 1 had a historical lifetime capacity factor of 46%. However, during the test year (the twelve-month period ending 30 September 1983), the capacity factor of Brunswick No. 1 was 15%. This was due to a major outage which occurred during the test year. However, improvements and modifications were made to the unit during the outage which would increase its performance. Howe testified that from late-August 1983 until mid-July 1984, Brunswick No. 1 operated at a 73% capacity factor. He further testified that the company expected the unit to operate at a capacity factor of approximately 70% when it was not in an extended outage. However, he stated that the company expected the unit to operate at a 29% capacity factor from October 1984 until September 1985 (the period during which the rates set would likely be in effect) due to planned outages.

Howe also testified with regard to the performance of Brunswick No. 2. He stated that the actual test-year capacity factor for that unit was 57%. He further testified that improvements and modifications had been made to the unit which were expected to improve its performance. He testified that the company expected the unit to operate at a 65% capacity factor during the period the rates would likely be in effect. This estimate took into account a scheduled outage for the period 1 October 1984 through 17 November 1984.

State ex rel. Utilities Comm. v. Thornburg, Atty. Gen.

CP&L witness McDuffie testified with regard to the performance of Robinson No. 2. He stated that the unit had a historical lifetime capacity factor of 66% and an actual test-year capacity factor of 67%. He testified that the unit would come back on line in December 1984 and that the company expected the unit to operate at an 85% capacity factor from that time through October 1985.

Evidence was also presented that showed the company's test-year system nuclear capacity factor was below the national averages for 1982 and 1983.[4] Furthermore, although the test-year capacity factor for Robinson No. 2 was approximately three percentage points higher than the national ten-year average capacity factor for pressurized water reactors, the test-year capacity factor for Brunswick No. 1 was forty-five percentage points below the national ten-year average for boiling water reactors, and the figure for Brunswick No. 2 was three percentage points below the national ten-year average for boiling water reactors.

We feel that this evidence supports the Commission's conclusion that CP&L's test-year system nuclear capacity factor was abnormally low. The test-year system nuclear capacity factor of 45% was below the historical lifetime capacity factors of Brunswick No. 1 and Robinson No. 2. The test-year capacity factor for Brunswick No. 1 was fourteen percentage points lower than the unit's projected capacity factor for the period during which the rates set would likely be in effect. The test-year capacity factor of Brunswick No. 2 was eight percentage points lower than that expected during the period the rates would likely be in effect. The test-year capacity factor of Robinson No. 2 was eighteen percentage points lower than that expected during the period the rates would likely be in effect. These figures included outages scheduled for the various units during the period the rates were expected to be in effect. The test-year system nuclear capacity factor was below the national average for the two calendar years encompassed by the test year.

---

4. The national average capacity factor for 1982 was 56%. The average for 1983 was 55%.

·The evidence tending to show that CP&L's test-year system nuclear capacity factor was abnormally low was competent, material, and substantial. The Commission's finding that the abnormality existed is therefore conclusive on this Court. *See Utilities Comm. v. Carolina Utilities Customers Association*, 314 N.C. 171, 333 S.E. 2d 259.

CP&L next contends that assuming its test period nuclear capacity factor was abnormal, the Commission failed to explain how it arrived at its conclusion that 53.4% was the normal capacity factor. Although the Commission failed to explicitly set out the manner by which it arrived at this conclusion, it is clear that the figure adopted by the Commission was based on the testimony and calculations of Public Staff witness Lam. Lam testified that his fuel cost calculation was based on a normalized system capacity factor of 53.4%. The Commission recited Lam's testimony in the order, as well as testimony from other witnesses concerning their proposed normalized capacity factor. In its order, the Commission stated: "Based upon all of the evidence, the Commission concludes that a normalized generation mix which reflects a system nuclear capacity factor of approximately 53.4% and a level of nuclear generation which is properly associated with that capacity factor are appropriate for use in this proceeding." This, along with the fact that the Commission adopted Lam's proposed fuel cost calculation (which was based in part on a 53.4% capacity factor), leads to the inescapable conclusion that the Commission's conclusion was based on its acceptance of Lam's methodology for calculating the normalized capacity factor. We take this opportunity, however, to urge the Commission to endeavor to be as specific as possible in explaining the basis of its findings.

CP&L next argues that if the Commission did base its normalization adjustment on Lam's calculations, the adjustment was improper, as Lam's calculations are erroneous. Before addressing this contention, we deem it appropriate to briefly examine the normalization methodology employed by Lam.

As noted previously, Lam utilized the national average capacity factors computed by the North American Electric Reliability Council for the period 1972-81 in normalizing CP&L's system capacity factor. He replaced Robinson No. 2's actual test-year capacity factor with the North American Electric Reliability

Council's national average of 62.7% for pressurized water reactors. He replaced the actual test-year capacity factors of Brunswick No. 1 and No. 2 with the North American Electric Reliability Council's national average of 60% for boiling water reactors. Lam then adjusted these national averages downward to take into account the fact that Robinson No. 2 was scheduled to be out of service until two and one-half months after the rates would go into effect, and Brunswick No. 2 would not come back on line until two months after the rates would go into effect.

CP&L initially argues that Lam's calculations were flawed because it is inappropriate to use national averages as a basis for calculating a "normal" capacity factor. In support of this contention, the company cites *Utilities Comm. v. Gas Company*, 254 N.C. 536, 119 S.E. 2d 469. There, we stated our disapproval of the Commission's action disallowing all promotional expenditures by the utility which exceeded the national average. However, in that case, the Commission made no adjustment to the national average to take into consideration special circumstances unique to the utility. Indeed, we noted that the utility was faced with its own unique marketing environment, which differed from that faced by other utilities. Here, the Commission did not set total fuel cost on the basis of unadjusted national average capacity factors, but instead used the averages as a *starting point* for the normalization process. The national averages were adjusted to take into consideration unique, inherent factors which would impact upon the capacity factors (i.e., the scheduled outages at Robinson No. 2 and Brunswick No. 2). We find nothing improper in the use of national averages as long as proper adjustments are made to reflect unique characteristics of the utility. Such adjustments were made in the present case.

CP&L next claims that Lam's calculations were erroneous because, while he adjusted for scheduled outages at Robinson No. 2 and Brunswick No. 2, he failed to take into consideration a planned outage at Brunswick No. 1. Company witness Howe testified that an outage was scheduled for Brunswick No. 1 which would occupy approximately six months of the period the rates would be in effect. Lam's calculations did not include this outage. He testified that he did not include this outage because in contrast to the outages at Robinson No. 2 and Brunswick No. 2, the outage at Brunswick No. 1 was not a known and measurable

State ex rel. Utilities Comm. v. Thornburg, Atty. Gen.

change at the time of the hearing. Furthermore, Howe intimated that the company was negotiating with the Nuclear Regulatory Commission to change the timing of the projected outage at the unit. In light of the testimony tending to show the uncertainty of the timing of any outage at Brunswick No. 1, we conclude that the Commission did not err in accepting Lam's calculations which failed to include the company's projected outage at that unit.

CP&L next argues that Lam's calculation is flawed by the fact that the national average capacity factors which were utilized in the calculation were out of date. We do not agree. The national averages used by Lam were for the period 1972-81. Although the company did present some evidence as to the national average of all reactors of 400 megawatts or more for the years 1982 and 1983, Lam testified that the trend for the years 1979-83 was basically flat. Furthermore, the company's evidence as to the national averages for the years 1982 and 1983 only included reactors of 400 megawatts or more and did not set out separate averages for pressurized water reactors and boiling water reactors. We conclude that Lam's calculation is not rendered invalid by the fact that the national averages which were utilized did not encompass any period beyond 1981.

Finally, the company argues that Lam's calculation is flawed because he failed to use national averages for all elements of the fuel cost calculation. CP&L argues that if national averages are to be used, they should be used for all elements of the computation. We do not agree.

It would be clearly improper to use national averages for certain elements. For example, it would not be appropriate to use the national average for the cost of coal due to the price differential to various utilities resulting from their close proximity to or long distance from the mines. For obvious reasons, it would also be inappropriate to use national climatic averages for weather normalization. However, a utility's nuclear plant capacity factor is a component of the fuel cost calculation that naturally lends itself to a comparison with those of other companies. Furthermore, we note once again that the Commission did not set total fuel cost on the basis of the unadjusted national average, but instead adjusted the average to take into consideration circumstances unique to CP&L which would impact upon the capacity factors.

We hold that the Commission did not err in finding that the test-year fuel costs were abnormal and that the company's normalized system nuclear capacity factor was 53.4%. There was competent, material, and substantial evidence that CP&L's test-year system nuclear capacity factor was abnormally low, and we find that the Commission did not err in the methodology employed to arrive at the company's normalized system capacity factor.

### III.

**[9]** CP&L's final argument centers on the Commission's directive that it refund to its customers the funds in the deferred fuei account which the Commission ordered the company to establish in its 1983 general rate case, Docket No. E-2, Sub 461. In that case, the utility was ordered to place any fuel cost over-collections in the special account. In other words, the account would include the amount by which allowable fuel costs exceeded actual fuel costs. The Commission was to review the company's actual fuel costs in the next general rate case or in a proceeding pursuant to N.C.G.S. § 62-133.2 and require the company to refund any over-collection to the customers. However, if CP&L under-recovered its fuel costs, it would not be permitted to recover the under-collection.

At the time of the hearing, the deferred fuel account reflected over-collections of approximately $2,566,418. Approximately $173,000 of the account had been effectively refunded to the ratepayers through certain adjustments to operating and maintenance expenses, leaving a net account of $2,387,000. In order to effectuate a refund of the funds in this account, the Commission reduced the company's annual rate increase by $2,387,000.

CP&L initially contends that the "one-way true-up" established in the 1983 rate case is arbitrary and capricious and openly discriminates against the company, as it requires the company to refund any over-collections while requiring it to absorb any under-collections. CP&L contends that basic fairness and the mandate in N.C.G.S. § 62-133(a) that rates shall be fair to both the utility and the customer require that either the rates be fixed or that any "true-up" run both ways.

We find it unnecessary to decide this question. By its order in this rate case, the Commission closed out the deferred fuel ac-

count established in the 1983 general rate case. The account had a positive balance — in other words, the company had over-collected its fuel costs. This amount was ordered refunded. There was no actual under-collection, and since the account was closed, there can be no future under-collections. The question of whether a two-way true-up should have been established is therefore moot.

The company is correct, however, when it argues that the Commission erred by refunding the over-collections by deducting the amount of the deferred fuel account from CP&L's annual rate increase. This would, in effect, require the company to pay the refund annually for as long as the rates fixed in this case remain in effect. The Commission should have provided for a lump-sum refund (i.e., one-time rate reduction) or a rate reduction over a period of time. We therefore remand the case to the Commission with instructions that it take appropriate measures to correct this situation.

To summarize, we hold: (1) the Commission did not err by including $663,167,000 of CWIP in CP&L's rate base; (2) the Commission did not err in calculating CP&L's fuel costs; (3) the Commission did not err in ordering a refund of the deferred fuel account, but it did err by ordering a deduction from the company's annual rate increase in the amount of the refund. For the reasons stated herein, the order of the Commission is affirmed in part, reversed in part, and remanded to the Commission for further proceedings not inconsistent with this opinion.

Affirmed in part, reversed in part, and remanded.