# SUPREME COURT

OF

# NORTH CAROLINA

AT

# RALEIGH

---

STATE OF NORTH CAROLINA ex rel. UTILITIES COMMISSION v. CARO-
LINA POWER & LIGHT COMPANY, APPLICANT; CAROLINA UTILITY
CUSTOMERS ASSOCIATION, INC., INTERVENOR; KUDZU ALLIANCE,
INTERVENOR; PUBLIC STAFF—NORTH CAROLINA UTILITIES COM-
MISSION, INTERVENOR; AND LACY H. THORNBURG, ATTORNEY GEN-
ERAL, INTERVENOR

No. 591A85

(Filed 7 July 1987)

1. **Electricity § 3; Utilities Commission § 38— electric rates—adjustment of test
period data—effect of management prudence**

   Although management prudence may be an important factor considered
   by the Utilities Commission in a general rate case, management prudence *vel
   non* does not control the Commission's decision as to whether to adjust test
   period data to reflect abnormalities having a probable impact on the utility's
   revenues and expenses during the test period in order that it may set reasona-
   ble rates in compliance with N.C.G.S. § 62-133.

2. **Electricity § 3; Utilities Commission § 38— electric rates—normalizing nuclear
capacity factor**

   The Utilities Commission did not err in a general rate case by normalizing
   the nuclear capacity factor component of CP&L's generation mix for the test
   periods to reflect the average lifetime nuclear capacity factors actually
   achieved by CP&L as of the end of each of the test periods in question where
   the Commission found that the nuclear capacity factors for the test years were
   abnormal and not reasonably representative of an acceptable system nuclear
   capacity factor for rate making purposes, notwithstanding the Commission also
   found that CP&L's fuel procurement practices were prudent during the test
   periods. N.C.G.S. § 62-133(c) and (d) (1982).

1

3. **Electricity § 3; Utilities Commission § 38— electric rates—fuel costs and rates —adoption of accounting method**

Competent, material and substantial evidence supported the Utilities Commission's findings in applying accounting methods proposed by a witness for CP&L rather than by other expert witnesses in calculating the fuel costs and rates that CP&L should have collected during the disputed periods had the regulatory statutes been properly applied at the time the cases were originally heard.

4. **Electricity § 3; Utilities Commission § 38— electric rates—calculation of fuel adjustments**

The Utilities Commission properly calculated fuel adjustments in accordance with the formula approved in *State ex rel. Utilities Commission v. Edmisten*, 291 N.C. 327, 230 S.E. 2d 651 (1976). The *Edmisten* fuel adjustment formula was not invalidated by the enactment of N.C.G.S. § 62-134(e), and the Commission was not required by public policy or legislative intent to use a formula by which fuel expense adjustments are made only on the basis of changes in the unit prices of fossil fuels.

5. **Electricity § 3; Utilities Commission § 38— electric rates—surcharge to cover fuel costs—no estoppel**

CP&L was not estopped from seeking in the proceeding on remand a surcharge to cover its fuel related costs because it defended the Commission's two-track rate making system in the original appeals of general rate cases and the two-track system has been held unlawful.

ON appeal from an order of the North Carolina Utilities Commission entered on 10 September 1985. Heard in the Supreme Court on 9 March 1987.

*Richard E. Jones, Robert W. Kaylor and Robert S. Gilliam for Carolina Power & Light Company.*

*Thomas R. Eller, Jr. and Byrd, Byrd, Ervin, Whisnant, McMahon & Ervin, P.A., by Sam J. Ervin, IV, for Carolina Utility Customers Association, Inc.*

*Edelstein and Payne, by M. Travis Payne, for Kudzu Alliance.*

*Robert P. Gruber, Antoinette R. Wike and Gisele L. Rankin for Public Staff.*

*Lacy H. Thornburg, Attorney General, and Karen E. Long, Assistant Attorney General.*

State ex rel. Utilities Comm. v. Carolina Power & Light Co.

MITCHELL, Justice.

The questions before us on appeal arise from an order of the North Carolina Utilities Commission entered after reconsideration of three general rate cases[1] and six fuel adjustment proceedings.[2] All of the cases were originally filed by Carolina Power & Light Company (hereinafter "CP&L") and initially heard by the Commission during the period 1979-82. Five of the cases were appealed by one or more intervenors. This Court or the Court of Appeals remanded each of those cases to the Commission after holding its order erroneous.[3]

The Commission consolidated the five cases on remand. In its effort to comply with the instructions of this Court and the Court of Appeals, the Commission also reopened one additional general rate case (Sub 366)[4] and three fuel adjustment proceedings (Sub 420, Sub 434 and Sub 452) and consolidated them with the remanded cases.[5]

1. The three general rate cases are reported at Carolina Power & Light Co., Docket No. E-2, Sub 366, *Seventieth Report of the North Carolina Utilities Commission: Orders and Decisions* 207 (22 April 1980); Carolina Power & Light Co., Docket No. E-2, Sub 391, *Seventy-First Report of the North Carolina Utilities Commission: Orders and Decisions* 212 (15 January 1981); and Carolina Power & Light Co., Docket No. E-2, Sub 416, *Seventy-Second Report of the North Carolina Utilities Commission: Orders and Decisions* 121 (12 February 1982).

2. The six fuel adjustment proceedings — of which only two are reported in the Commission's Official Reports — are: Carolina Power & Light Co., Docket No. E-2, Sub 402 (24 October 1980); Carolina Power & Light Co., Docket No. E-2, Sub 411, *Seventy-First Report of the North Carolina Utilities Commission: Orders and Decisions* 221 (27 February 1981); Carolina Power & Light Co., Docket No. E-2, Sub 420 (18 June 1981); Carolina Power & Light Co., Docket No. E-2, Sub 434 (22 October 1981); Carolina Power & Light Co., Docket No. E-2, Sub 446, *Seventy-Second Report of the North Carolina Utilities Commission: Orders and Decisions* 148 (26 February 1982); and Carolina Power & Light Co., Docket No. E-2, Sub 452 (17 June 1982).

3. *State ex rel. Utilities Commission v. Public Staff*, 309 N.C. 195, 306 S.E. 2d 435 (1983) (Sub 402 and Sub 411); *State ex rel. Utilities Commission v. N.C. Textile Mfrs. Assoc.*, 309 N.C. 238, 306 S.E. 2d 113 (1983) (Sub 391); *State ex rel. Utilities Commission v. Public Staff*, 64 N.C. App. 609, 307 S.E. 2d 803 (1983) (Sub 416); *State ex rel. Utilities Commission v. Kudzu Alliance*, 64 N.C. App. 183, 306 S.E. 2d 546 (1983) (Sub 446).

4. The general rate cases and fuel adjustment cases heard and decided by the Commission are referred to throughout this opinion by the docket numbers given them by the Commission, e.g., "Sub 366."

5. Under the procedure followed by the Commission at the time the cases resulting in this appeal were heard originally, rates in effect at any given time

A panel of the Commission held hearings in February and March of 1985. After additional hearings were held in May, a Recommended Order On Remand was filed on 18 June 1985. The intervenors, the Attorney General, the Public Staff, Kudzu Alliance (hereinafter "Kudzu") and Carolina Utility Customers Association, Inc. (hereinafter "CUCA")[6] filed exceptions to the Recommended Order. The Commission heard oral arguments in August and entered its Final Order on Remand Requiring Customer Refunds on 10 September 1985. CP&L and all intervenors appealed to this Court.

The three primary issues before this Court on appeal are (1) whether the Commission erred by "normalizing" CP&L's fuel costs for test periods involved in the general rate cases, (2) whether the Commission erred by applying accounting methods proposed by a witness for CP&L, and (3) whether the Commission erred by applying an improper formula for fuel cost adjustments. We find no error and affirm the order of the Commission.

We do not undertake a complete review of all of the evidence introduced as it is in the form of several thousand pages of transcripts and exhibits. Specific evidence and what it tended to show is discussed throughout this opinion where pertinent and necessary.

A brief historical review is necessary to an understanding of the issues presented and the unique posture of the cases before us on appeal. Public utilities were first permitted to make interim adjustments to their rates in North Carolina in response to rapidly rising fossil fuel costs resulting from the effects of an oil embargo imposed by the Organization of Petroleum Exporting Countries in the mid-1970s. The first "fuel adjustment clauses" approved by the Commission operated automatically. Rather than being required to apply to the Commission for every rate adjustment, public utilities were permitted to adjust their rates unilaterally once each month to reflect changes in their fuel costs.

were based on two cases—one general rate case and one fuel adjustment proceeding.

6. The record reflects that CUCA is the successor organization to the former North Carolina Textile Manufacturers Association.

In 1975, the General Assembly enacted former N.C.G.S. § 62-134(e) (repealed 17 June 1982) which provided that rates could be adjusted on the basis of changes in fuel costs only with approval of the Commission after a public hearing. 1975 N.C. Sess. Laws ch. 243, § 8; repealed 1981 N.C. Sess. Laws ch. 1197, § 2. The statute also provided for expedited hearings in fuel adjustment proceedings.

In its efforts to implement N.C.G.S. § 62-134(e), the Commission adopted regulations and a fuel cost formula which were amended occasionally in light of experience. By 1978, a "two-track" rate making system had evolved. Under that system, all fuel related costs were considered in fuel adjustment proceedings, but excluded in general rate cases. Other operating costs, together with a proper rate of return, were considered in general rate cases but excluded from consideration in fuel adjustment proceedings.

In 1980 our Court of Appeals held that issues relating to management prudence should be considered only in general rate cases and not in fuel adjustment proceedings under N.C.G.S. § 62-134(e). *State ex rel. Utilities Commission v. Virginia Electric & Power Co.*, 48 N.C. App. 453, 269 S.E. 2d 657, *disc. rev. denied*, 301 N.C. 531, 273 S.E. 2d 462 (1980). While recognizing the correctness of that holding by the Court of Appeals, this Court thereafter determined that the Commission's two-track rate making system was inconsistent with the requirements of N.C.G.S. § 62-133 and former N.C.G.S. § 62-134(e). *See generally, State ex rel. Utilities Commission v. Public Staff*, 309 N.C. 195, 306 S.E. 2d 435 (1983). In reviewing the Commission's prior orders in two of the fuel adjustment proceedings presently before us—Sub 402 and Sub 411—we held that the Commission had erred by failing to establish a new base cost of fuel in each general rate case. *Id.* We also held that it had erred by including purchased power costs and nuclear fuel costs in fuel adjustment proceedings. *Id.* We recognized, however, that even though purchased power costs and nuclear fuel costs had been improperly considered in fuel adjustment proceedings before the Commission, they had also been improperly excluded from consideration in general rate cases to the detriment of public utilities. *Id.* Therefore, we remanded the fuel adjustment proceedings before us for a hearing "in the nature of" a general rate case. *Public Staff*, 309 N.C. at 213, 306

S.E. 2d at 445. We also directed the Commission to consider the reasonableness and prudence *vel non* of CP&L's management in incurring the costs for the purchases and exchanges of power in question. We instructed the Commission to contrast the rates actually collected with those which should have been collected and to make such adjustments as necessary to correct any discrepancy. *Public Staff*, 309 N.C. at 214, 306 S.E. 2d at 446.

The appellate opinions in the other cases remanded to the Commission and dealt with in its order giving rise to this appeal were quite brief and cited our decision in *Public Staff* as controlling.[7] Those cases and *Public Staff* represent practical applications, in cases remanded for recalculations, of the principle that a public utility must be given at least one fair opportunity at some point to recover all of its reasonably and prudently incurred fuel and purchased power costs,[8] if rates are to "be fair both to the public utility and to [consumers]" as required by N.C.G.S. § 62-133(a).

On remand, the Commission consolidated the five remanded cases with four reopened cases that had affected CP&L's rates during the rate periods in dispute here—the 22 months from 1 December 1980 to 23 September 1982. The Commission held hearings to determine the rates that should have been collected during those rate periods.

CP&L introduced extensive testimony and numerous exhibits through expert witnesses with regard to its practices in purchasing fuel and power. It also introduced expert testimony as to the efficiency of the operation of its generating plants. CP&L's evidence tended to show that, at all pertinent times, its fuel and power purchasing practices were reasonable and prudent, it operated its generating plants in a prudent manner, and no fuel or purchased power costs were incurred unreasonably or imprudently.

The Commission's hearings were conducted "in the nature of" a general rate case according to our instructions in *Public Staff*.

7. *See* cases cited *supra* note 3.

8. In *State ex rel. Utilities Commission v. N.C. Textile Mfrs. Assoc.*, 309 N.C. 238, 306 S.E. 2d 113 (1983) (Sub 391), for example, we found *Public Staff* controlling and remanded to the Commission with instructions to determine the reasonableness of CP&L's expenses for fuel and purchased power.

However, the intervenors offered no evidence of imprudence on the part of CP&L.

CP&L introduced evidence in the form of testimony and exhibits by an accounting expert, David R. Nevil, to show how he had recalculated the rates for each of the general rate cases and fuel adjustment proceedings in question. He testified that his recalculations showed that the rates which should have been collected by CP&L for the disputed rate periods exceeded the rates actually collected by $7,366,019.

The intervenors introduced evidence concerning their own recalculations of the rates in question. The Public Staff introduced evidence through an accounting expert, Candace A. Paton, who testified that CP&L had actually collected $72,487,741 in excess of the rates it should have collected. Accounting experts for CUCA, John W. Wilson and Charles E. Johnson, testified that CP&L had actually collected $120,515,060 in excess of the rates it should have collected.

A major area of dispute during the hearings before the Commission involved the concept of "normalizing" the nuclear capacity factor component of CP&L's test period generation mix. The intervenors argued that allowable fuel costs for the general rate cases should not be calculated on the basis of the actual test period fuel costs incurred by CP&L, but instead on the basis of the costs CP&L would have experienced if its nuclear plants had operated at a "normal capacity factor" selected by the Commission. The intervenors argued that the correct normal capacity factor was the capacity factor CP&L should have been expected to achieve in the "future" at the time when the rates would apply — a time in fact past when the Commission's hearings giving rise to this appeal were held. CP&L contended that such normalization of test period nuclear capacity factors, while appropriate in projecting anticipated fuel costs in an ordinary rate case, was impractical and improper in these cases, where the Commission was forced to fix rates for a period which had already passed. CP&L argued that rates in such cases should take into account actual fuel costs during the periods to which the rates apply, unless they were imprudently incurred.

In its Final Order on Remand Requiring Customer Refunds entered on 10 September 1985, the Commission "normalized" the

nuclear capacity factor component of CP&L's generation mix for the test periods in question. In its final order, the Commission concluded that the total of the rates actually collected by CP&L during the periods at issue exceeded the total amount it should have collected by $1,512,523. Accordingly, the Commission ordered CP&L to refund that amount plus interest to the rate payers. CP&L and all intervenors appealed to this Court.

## CP&L's Appeal

On appeal, CP&L contends that the Commission erred by normalizing the nuclear capacity factor component of CP&L's generation mix for the test periods involved. We hold that the Commission did not err in this regard.

This Court has given its specific approval to the process of normalizing the nuclear capacity factor component of a public utility's test period generation mix in a general rate case. *State ex rel. Utilities Commission v. Thornburg*, 316 N.C. 238, 342 S.E. 2d 28 (1986). We did so because we concluded that the practice complied with N.C.G.S. § 62-133 requiring the Commission "to adjust test period data to reflect abnormalities which had a probable impact on the utility's revenues and expenses during the test period." We also felt that the practice would be of assistance in setting the utility's future rates, because it would aid the Commission in more accurately anticipating the utility's future expenses for purchased power and fuel. Accordingly, we indicated that such normalization is appropriate when test period fuel costs are affected by abnormalities in the test period nuclear capacity factor affecting the generation mix used by the utility. 316 N.C. at 253, 342 S.E. 2d at 38.

In its final order of 10 September 1985 giving rise to this appeal, the Commission made proper findings upon substantial evidence and specifically determined that CP&L's fuel procurement practices and its power purchasing practices were prudent during the test periods for the general rate cases in question here. Nevertheless, the Commission found *inter alia*:

11. In determining the base fuel component which should have been established in each of CP&L's general rate cases in Docket Nos. E-2, Sub 366, E-2, Sub 391, and E-2, Sub 416, it is reasonable and appropriate to use a normalized generation

mix which reflects the lifetime historical average level of CP&L's nuclear generation. The lifetime historical average level of nuclear generation should be calculated as of the end of the test period utilized by the Commission in each reopened general rate case docket to which said average level of nuclear generation is applied. The resulting lifetime historical average levels of nuclear generation in these proceedings are 60.79% for Docket No. E-2, Sub 366, 58.96% for Docket No. E-2, Sub 391, and 57.05% for E-2, Sub 416. The normalized level of sources of supply should be calculated in a manner consistent with previous practices. These normalization adjustments are tailored specifically to CP&L's own nuclear generating units and the Company's historical operating experience in order to adopt *reasonable* and *representative* fuel costs in these proceedings on remand which are fair and equitable to both CP&L and its rate-paying customers.

(Emphasis added.)

At a later point in its order, the Commission reviewed the evidence in support of this finding and entered conclusions including the following:

As to the appropriate normalized level of nuclear generation, the Commission notes that the lifetime capacity factors actually achieved by nuclear units nationwide as reported by the North American Electric Reliability Council Equipment Availability Report for the 10 year periods ending in the periods involved in the proceeding averaged 60% in 1979, 59.8% for 1980, 61.5% for 1981, and 60.3% for 1982.

CP&L's average *lifetime* nuclear capacity factors actually achieved for the three general rate case test periods involved in the case compare favorably to those actually achieved by all nuclear units in the United States. They are 60.79% for general rate case Docket No. E-2, Sub 366, 58.96% for general rate case Docket No. E-2, Sub 391, and 57.05% for Docket No. E-2, Sub 416. The average achieved *lifetime* capacity factor for CP&L's nuclear plants for the period involved in these proceedings is only one to two percentage points less than that achieved nationally by all nuclear plants and closely approximates the 60% target or objective specified in Rule R8-46.

CP&L's average *actually achieved* nuclear capacity factor for the test year used in general rate case Docket No. E-2, Sub 366 was 70.7%; for the test year used in general rate case Docket No. E-2, Sub 391, it was 56.8%; and for the test year used in general rate case Docket No. E-2, Sub 416, it was 45.75%. The average capacity factor *actually achieved for the test years* in the three general rate cases was only one to two percentage points below CP&L's average achieved *lifetime* system nuclear capacity factor for the period.

Upon review of CP&L's *actual test year* nuclear capacity factors on remand, the Commission concludes that it is appropriate to use a normalized generation mix which reflects the *lifetime historical average level of CP&L's nuclear generation* in determining the base fuel component which should have been established in each of the reopened general rate cases in Docket Nos. E-2, Sub 366, E-2, Sub 391, and E-2, Sub 416. The *lifetime historical average level of nuclear generation* should be calculated as of the end of the test period utilized by the Commission in each reopened general rate case docket to which said average level of nuclear generation is applied. The Commission concludes that such normalization will establish CP&L's generation mix for rate-making purposes on remand at *reasonable* and *representative* levels which are fair to both the Company and its ratepayers. In particular, the Commission concludes that the 45.75% nuclear capacity factor which CP&L experienced during the test years for Docket No. E-2, Sub 416 was abnormally low and not reasonably representative of an acceptable system nuclear capacity factor for ratemaking purposes and should not reasonably be expected to reoccur in subsequent periods. Thus, normalization is clearly appropriate and justified, *even in the absence of a finding of management imprudence related to nuclear plant performance.* Normalization of CP&L's nuclear capacity factor at 60.79% in Docket No. E-2, Sub 366 also serves to establish a more reasonable and representative nuclear capacity factor for ratemaking purposes to the benefit of CP&L in that case since the test year nuclear generation of 70.7% was, in effect, abnormally high. Normalization in Docket No. E-2, Sub 391 is generally of little consequence in view of the Company's actual test year

nuclear generation. For purposes of these proceedings on re-
mand, the normalization adjustments adopted by the Commis-
sion *are tailored specifically to CP&L's own nuclear
generating units and the Company's historical operating ex-
perience* in order to adopt *reasonable* and *representative* fuel
costs which are fair and equitable to both CP&L and its rate-
paying customers.

(Emphasis added.)

CP&L contends, and we agree, that the Commission made no
finding of management imprudence and, to the extent it made
findings concerning such questions, the Commission's findings are
to the effect that the actions of CP&L's management were pru-
dent. CP&L argues that, given the absence of any finding of
management imprudence, the Commission was required to use
CP&L's actual fuel expenses when fixing rates for the three
general rate cases involved in this appeal (Sub 366, Sub 391 and
Sub 416). We do not agree.

In *State ex rel. Utilities Commission v. Morgan*, 278 N.C. 235,
236-37, 179 S.E. 2d 419 (1971), we explained that:

The basic, underlying theory of using the Company's
operating experience in a test period, recently ended, in fix-
ing rates to be charged by it for its service in the near future
is this: Rates for service, in effect throughout the test period,
will, in the near future, produce the same rate of return on
the company's property, used in rendering such service, as
was produced by them on such property in the test period,
*adjusted for known changes and conditions.*

(Emphasis added.)

[1] In *State ex rel. Utilities Commission v. City of Durham*, 282
N.C. 308, 193 S.E. 2d 95 (1972), we dealt with a situation in which
the Commission had adjusted test period fuel expenses to reflect
substantially abnormal weather conditions which had occurred
during the test period. Although abnormal weather conditions are
a factor clearly unrelated to management prudence, we found no
error in the Commission's adjustment of test period expenses and
revenues to take such abnormalities into account when setting
rates for the near future. To the contrary, we stated that:

The actual experience of the company during the test period, both as to revenues produced by the previously established rates and as to operating expenses, is the basis for a reasonably accurate estimate of what may be anticipated in the near future if, *but only if,* appropriate *pro forma* adjustments are made for abnormalities which existed in the test period and for changes and conditions occurring during the test period and, therefore, not in operation throughout its entirety.

*Id.* at 320, 193 S.E. 2d at 104 (emphasis added). Therefore, although management prudence may be an important factor considered by the Commission in a general rate case, management prudence *vel non* does not control the Commission's decision as to whether to adjust test period data to reflect abnormalities having a probable impact on the utility's revenues and expenses during the test period, in order that it may set reasonable rates in compliance with N.C.G.S. § 62-133. We implied as much in *Thornburg,* where we applied the statute in upholding an adjustment by the Commission to the test period nuclear capacity factor, and stated that:

Since fuel costs comprise a large portion of a utility's expenses, the statutory mandate to normalize test period data includes a requirement that the Commission adjust the test period fuel cost for any abnormalities established by competent, material, and substantial evidence. Since the system nuclear capacity factor directly impacts upon the generation mix, which in turn affects fuel costs, *any* abnormality in the system nuclear capacity which is shown to have existed during the test year must be adjusted.

316 N.C. at 253, 342 S.E. 2d at 38 (emphasis added). However, the statute does not require the Commission to normalize where the variation between the test period experience and the average experience is slight. "The maxim, *de minimis non curat lex,* is applicable to what might be called normal variations from the average." *City of Durham,* 282 N.C. at 321, 193 S.E. 2d at 104-105.

CP&L also contends that normalization is not justified under the peculiar facts involved in this remand proceeding before the Commission. CP&L argues that normalization is used in the ordinary general rate case for estimating what may be anticipated

in the near future. Given the peculiar situation faced by the Commission here, however, CP&L argues that the Commission was not called upon to estimate or anticipate future events. Instead, it was required to recalculate rates at a time when the fuel costs actually incurred during the period to which the rates applied were already known. CP&L argues, therefore, that the Commission should have considered the fuel costs actually incurred during the rate periods in these general rate cases when fixing the rates. We do not agree.

We find it unnecessary to belabor the point to conclude that the legislature did not intend that the Commission consider fuel expenses actually occurring during the rate period when it required the Commission to consider evidence of certain matters "based upon circumstances and events occurring up to the time the hearing is closed." N.C.G.S. § 62-133(c) (1982). Nor do we believe that the legislature intended the Commission to consider actual fuel expenses incurred during the rate period when it required the Commission to "consider all other material facts of record that will enable it to determine what are reasonable and just rates." N.C.G.S. § 62-133(d) (1982). We have recognized in this regard that the Commission may in certain situations consider changes in costs and revenues expected to occur within a reasonable time after the test period. *State ex rel. Utilities Commission v. Carolina Utilities Customers Assoc.*, 314 N.C. 171, 199-200, 333 S.E. 2d 259, 276-77 (1985). To hold that the Commission was required to rely upon the actual fuel expenses incurred during the period to which the rates applied in setting reasonable rates would, however, tend to render completely meaningless the legislative directive that the test period "shall consist of 12 months' historical operating experience prior to the date the rates are proposed to become effective . . . ." N.C.G.S. § 62-133(c) (1982). We conclude that the legislature intended no such result, even in a remand proceeding such as that involved here.

[2] In its order the Commission reviewed in considerable detail the substantial competent evidence supporting its findings as to CP&L's average *lifetime* nuclear capacity factors actually achieved and CP&L's actual *test year* nuclear capacity factors for the test periods involved in each of the three general rate cases. The findings support the Commission's conclusions that the nuclear capacity factors for these test years were abnormal and

"not reasonably representative of an acceptable system nuclear capacity factor for ratemaking purposes and should not reasonably be expected to reoccur in subsequent periods." Having made such findings and conclusions, the Commission did not err by normalizing the nuclear capacity factors for the test periods to reflect the average *lifetime* nuclear capacity factors actually achieved by CP&L as of the end of each of the test periods in question. *See Thornburg*, 316 N.C. 238, 342 S.E. 2d 28. This is particularly true, since the Commission found on competent evidence that CP&L's lifetime achieved nuclear capacity factors as of the end of each test period did not vary significantly from the national average. *See generally, id.*

### INTERVENORS' APPEAL

[3] An issue raised and argued on appeal by all intervenors is whether the Commission erred by selecting CP&L witness Nevil's accounting method rather than adopting accounting methods advocated by witnesses for the intervenors. The various intervenors have given us the benefit of several hundred pages of briefs on this issue, and the Public Staff has stated that it "may well be the single most complicated and . . . conceptually difficult question ever put to the Commission or this Court." The question before us on appeal actually is not quite so difficult and may be disposed of in a manner akin to that used by Alexander in dealing with the Gordian Knot.

In our opinion in *Public Staff*, we directed the Commission on remand to calculate and contrast the rates actually collected by CP&L with the rates that it should have collected had the regulatory statutes been properly applied, then make adjustments as necessary. 309 N.C. at 213-14, 306 S.E. 2d at 445-46. The cases giving rise to this appeal were controlled on remand by our opinion in *Public Staff. See, e.g., N.C. Textile Mfrs. Assoc.*, 309 N.C. 238, 306 S.E. 2d 113 (1983).

No party has excepted to the Commission's calculation that the fuel-related revenues actually collected by CP&L during the disputed period were $531,194,993. However, the intervenors excepted to the Commission's use of the accounting method advocated by CP&L witness Nevil for calculating the fuel costs and the rates that CP&L should have collected, as well as the results it

reached using that method. They contended that both the method used and the results were erroneous.

CP&L witness Nevil testified at length in support of the accounting method eventually adopted by the Commission. CUCA witness Wilson testified in favor of another accounting method for calculating the rates that should have been collected. Wilson's method was endorsed by Public Staff witness Paton. The Commission ultimately determined that the proper accounting method to be used was that of Nevil.

The difficult issue the Commission was required to decide was whether Nevil's or Wilson's accounting method more correctly calculated the total fuel related revenue CP&L would have collected during the disputed periods if, at the time the cases before it were originally heard, the Commission had considered test period fuel costs in each general rate case and had excluded nuclear fuel and purchase power costs from fuel adjustment proceedings. In our view, that question was a question of fact and not of law.

We have frequently indicated that findings of the Commission on questions of fact must be upheld on appeal if supported by competent, material and substantial evidence in light of the entire record. *E.g., State ex rel. Utilities Commission v. Carolina Utilities Customers Association,* 314 N.C. 171, 190, 333 S.E. 2d 259, 271 (1985). As a general rule, it is for the Commission, not the reviewing court, to determine the credibility of and the weight to be given to all competent evidence. The rule is fully applicable when there is conflicting testimony by experts as to which method among those available to experts in their field is best suited for use in resolving a particular question they are asked to address as experts. *See State ex rel. Utilities Commission v. Telephone Co.,* 281 N.C. 318, 371, 189 S.E. 2d 705, 739 (1972). A reviewing court may neither retry such disputed questions of fact nor substitute its judgment for that of the Commission. *State ex rel. Utilities Commission v. City of Durham,* 282 N.C. 308, 193 S.E. 2d 95 (1972).

The evidence in support of the Commission's findings on the issue of the proper accounting method to be used here was competent, material and certainly substantial. It was composed primarily of the testimony of CP&L witness Nevil. In his direct

State ex rel. Utilities Comm. v. Carolina Power & Light Co.

testimony, Nevil explained in detail the accounting method he used. He testified that he had recalculated rates in each of the cases for the period in dispute and had determined the difference between the rates actually collected and the rates that should have been collected. He further testified that in making his recalculations, he corrected the two errors identified by the courts in the original rate orders in these cases. These were the error of considering nuclear fuel and purchased power costs in fuel adjustment proceedings and the error of failing to consider fuel costs in general rate cases. He also testified in detail as to how he had recalculated the rates for the general rate cases so as to reverse certain accounting adjustments made at the original hearings, because those adjustments had been made in order to avoid considering fuel costs in the general rate cases. The adjustments, therefore, did not comply with the more recent opinions of this Court and the Court of Appeals.

Nevil was cross-examined by the intervenors for more than four days. His testimony takes up more than 800 pages of the record before us. His testimony, found credible by the Commission, was sufficient to support the Commission's determination that the accounting method he used in recalculating the rates in question was proper and better suited to the task than the accounting methods advocated by the other expert witnesses.

The discussion of the question of the preferable accounting method took up twelve pages in the Commission's final order. The Commission first summarized the testimony of each witness as to the issue. The Commission discussed in detail the differences between the accounting methods and the testimony of the experts as to the strengths and weaknesses of each method. The Commission then compared the methods and found that Nevil's method was most consistent with the directions of this Court in *Public Staff* and with traditional rate making procedures. It is clear from the Commission's lengthy and logical discussion of the issue, that it gave full consideration to Wilson's testimony on behalf of his accounting method and considered all factors required by law. Without belaboring the issue further, it suffices to say here that the Commission's findings as to the proper accounting method to be used in fixing CP&L's rates were supported by competent, material and substantial evidence. The Commission did not err in this regard.

[4]   The Attorney General, Kudzu and CUCA also assign error to the Commission's determination of the increases to be allowed in the fuel adjustment proceedings. They contend that the fuel adjustment formula used by the Commission for such purposes was improper. We do not agree.

The Commission recalculated fuel adjustments in these proceedings strictly according to the formula[9] approved by this Court in *State ex rel. Utilities Commission v. Edmisten*, 291 N.C. 327, 230 S.E. 2d 651 (1976) (applying law in effect prior to 1975 enactment of N.C.G.S. § 62-134(e)). Under this formula the Commission determines the total fossil fuel costs incurred by the utility during the four month fuel adjustment test period, then divides that total by the number of kilowatt hours (kwh) sold during the test period to establish a fossil fuel cost per kwh. It then contrasts this per-kwh cost with the base fossil fuel factor fixed in the previous general rate case. The difference, adjusted for gross receipts tax, establishes the proper increase or decrease required to adjust rates to allow for changes in prices of fossil fuels burned.

In *Edmisten*, we recognized that use of the formula permits rates to be changed under the fuel clause to reflect both variations in the amount of each fuel burned and fluctuations in unit coal and oil prices. 291 N.C. at 336, 230 S.E. 2d at 657. Nevertheless, we approved use of the formula. In so doing, we implicitly rejected the argument, now advanced by the Attorney General, Kudzu and CUCA, that the Commission is required to use a formula by which fuel expense adjustments are made only on the basis of changes in the unit prices of fossil fuels.

After our opinion in *Edmisten*, the Commission made only one significant change in the fuel adjustment formula. In 1976, the

---

9. This formula is as follows:

$$F = E - \frac{(B \times G)}{S} \times \frac{1}{1 - T}$$

"F" represents the fuel adjustment. "E" represents the utility's test period burned fossil fuel costs. "B" represents the base fossil fuel cost calculated in the preceding general rate case. "G" represents the number of kilowatt hours (kwh) generated by the utility's fossil fuel plants during the test period. "S" represents the number of kwh sold by the utility during the test period. "T" represents the applicable state gross receipts tax rate. In *Edmisten*, we used the figure .000513 instead of the letter "B", because the base fossil fuel cost for the test period in that case was $00.0513 per kwh.

Commission added two new elements to the formula to reflect the cost of nuclear fuel and a portion of the cost of purchased power. The inclusion of those two elements in the formula used for fuel adjustment proceedings was held improper by this Court in *Public Staff*. The Commission responded to our *Public Staff* opinion appropriately in the fuel adjustment proceedings involved in this appeal by returning to the original formula approved in *Edmisten*.

The Attorney General, Kudzu and CUCA contend that our legislature invalidated the *Edmisten* fuel adjustment formula by its adoption of former N.C.G.S. § 62-134(e).[10] We conclude that the enactment of N.C.G.S. § 62-134(e) did not invalidate the *Edmisten* fuel adjustment formula.

Prior to the enactment of N.C.G.S. § 62-134(e), the Commission's fuel adjustment procedures had operated automatically. Utilities unilaterally adjusted their rates once a month under the Commission's formula without being required to obtain Commission approval. Former N.C.G.S. § 62-134(e) replaced this automatic procedure with one whereby each adjustment to rates was reviewed and approved by the Commission before being implemented. It is clear to us, however, that the statute merely was intended to create a change of procedure and not to terminate the use of the *Edmisten* formula.

CUCA points to a sentence in former N.C.G.S. § 62-134(e) providing that "monthly fuel adjustment rate increases based solely upon the increased cost of fuel . . . as presently approved by the commission shall fully terminate effective September 1, 1975 . . . ." CUCA argues that the sentence was meant to prohibit adjustments based upon actual increases in total expenses for fuel and to allow adjustments only for increased unit prices of fuel. We think it clear, however, that the sentence was intended only to provide that individual fuel adjustments that had been ap-

---

10. N.C.G.S. § 62-134(e) was repealed effective 17 June 1982. 1981 N.C. Sess. Laws ch. 1197, § 2. It was in effect at the time the fuel adjustment proceedings addressed in the Commission's order before us on appeal were initiated and originally decided, however, and CP&L and the intervenors agreed that it should be applied if recalculations were required relative to those proceedings. As can be seen throughout this opinion, they completely disagree as to the effects of its applicability and as to whether any recalculations were proper in those proceedings.

proved prior to 1 September 1975 would be terminated on that date, and that the new procedures established by the statute would apply prospectively to fuel adjustment proceedings.

Finally, Kudzu and CUCA make several arguments, based on perceived public policy or legislative intent, that the formula approved in *Edmisten* should be abandoned in favor of a formula allowing fuel adjustments based solely on the increased unit prices of fuel. It suffices to say that the substance of each of those arguments was considered by this Court when we approved the fuel adjustment formula of *Edmisten* originally and again when we rendered our opinion in *Public Staff.* We did not find the arguments persuasive on either of those occasions. We see no need to discuss them in detail now that N.C.G.S. § 62-134(e) has been replaced by N.C.G.S. § 62-133.2 providing an entirely new procedure for making fuel adjustments. The Commission did not err here by applying the fuel adjustment formula approved in *Edmisten.*

[5] Kudzu additionally contends that CP&L was estopped from seeking a rate surcharge when these cases were before the Commission in the proceeding on remand that resulted in its 10 September 1985 final order. Kudzu argues that CP&L defended the Commission's two-track system in the original appeals of the general rate cases and, now that the two-track rate making system has been held unlawful, may not argue that its rates should have been higher than the rates previously set under that system. We do not agree.

CP&L has argued at all times that, even if the Commission's two-track rate making system violated N.C.G.S. § 62-134(e), any of CP&L's fuel costs that were improperly considered in fuel adjustment proceedings were also improperly excluded from general rate cases, and that CP&L was entitled to recover them. The single argument that CP&L has made most unequivocally and consistently at all stages of these cases has been that it was entitled to recover its fuel costs in one type of proceeding or the other. CP&L was not estopped from arguing before the Commission or before this Court that it was entitled to recover its fuel related costs through a surcharge.

We have concluded that the 10 September 1985 final order of the Commission was free of error. For the reasons discussed herein, that order is affirmed.

Affirmed.