STATE OF NORTH CAROLINA EX REL. UTILITIES COMMISSION v. NORTH CAROLINA POWER

No. 230A93

(Filed 9 December 1994)

### 1. Utilities § 117 (NCI4th) — cogeneration projects—capacity payments—avoided costs

The Utilities Commission's disallowance of $1.39 million in expenses for capacity payments for the Ultra Cogen cogeneration projects did not violate the Public Utility Regulatory Policies Act (PURPA) to the extent it only excluded the amount above avoided costs (the incremental costs which the utility would incur if it supplied the power itself or purchased it from another source) where NC Power filed an application with the Commission to increase its rates and charges; the Commission ordered that $1.39 million of the capacity costs paid by NC Power to Ultra Cogen Systems be disallowed in calculating approved retail rates; electric utilities are required to purchase power produced by qualifying cogeneration and small power production facilities and are required to pay their avoided costs unless another rate is negotiated; NC Power rejected an offer from Ultra Cogen to sell it elec-

tricity; Ultra Cogen initiated arbitration proceedings with the Virginia State Corporation Commission; and NC Power was ordered to execute agreements with Ultra Cogen. Under FERC regulations, the purchase price for power sold by cogenerators is exempt from regulation by FERC and the rate is determined under federal rules implemented by each state for utilities subject to their ratemaking authority; however, states cannot impose purchase rates in excess of avoided costs.

**Am Jur 2d, Public Utilities §§ 133 et seq., 173 et seq.**

**2. Utilities § 117 (NCI4th)— cogeneration projects—capacity payments—measure of avoided costs**

It was not unreasonable in a general rate case involving the purchase of power from a cogenerator by NC Power (the North Carolina operation of Virginia Electric and Power Company) for the North Carolina Utilities Commission to use a competitive bidding measure in determining avoided costs where the Commission carefully reviewed the capacity rate set by an arbitrator designated by the Virginia State Corporation Commission and found that he did not properly take into account other potential sources of power, so that he greatly overestimated NC Power's avoided costs.

**Am Jur 2d, Public Utilities §§ 133 et seq., 173 et seq.**

**3. Utilities § 154 (NCI4th)— cogeneration projects—reasonable operating expenses—avoided costs**

The North Carolina Utilities Commission properly disallowed expenses for unreasonably high payments to a cogenerator in accordance with N.C.G.S. § 62-133 where NC Power, the North Carolina operation of Virginia Electric and Power Company, had purchased power from Ultra Cogen, a cogenerator; an arbitrator designated by the Virginia State Corporation Commission had set the capacity rate; and the North Carolina Utilities Commission determined that the arbitrator had not properly taken into account other sources of power, thereby assessing avoided costs unreasonably high. The Commission's exclusion of $1.39 million in expenses for capacity payments was merely the disallowance of the amount by which the contract rate exceeded NC Power's avoided costs.

**Am Jur 2d, Public Utilities §§ 133 et seq., 173 et seq.**

## 4. Constitutional Law § 155 (NCI4th)— cogeneration projects—disallowance of excess avoided costs—no violation of Commerce Clause

The North Carolina Utilities Commission's exclusion of $1.39 million of capacity costs paid by NC Power (the North Carolina operation of Virginia Electric and Power Company) to Ultra Cogen (a cogenerator) did not violate the Commerce Clause of the United States Constitution where the costs had been determined by an arbitrator designated by the Virginia State Corporation Commission. Congress, which has the power to regulate the relationships between cogenerators and electric utilities in order to protect interstate commerce, has specifically required each state to implement federal guidelines for each utility which it regulates. The North Carolina Utilities Commission's disallowance of excess avoided costs is consistent with federal regulation and constitutes lawful ratemaking. While inconsistent determinations of avoided costs by the VSCC and the Commission may burden NC Power, this is a necessary consequence of doing business in more than one state. NC Power argued before the VSCC that another method should have been used in determining avoided costs, but did not appeal, thus accepting the risk that the North Carolina Utilities Commission might not permit it to recover the excess amount from North Carolina consumers.

**Am Jur 2d, Commerce §§ 25 et seq.**

## 5. Utilities § 154 (NCI4th)— NC Power rates—officers' salaries—meeting demands of common shareholders

The Utilities Commission did not err in a general rate making case involving Virginia Electric and Power Company, which operates as North Carolina Power in North Carolina, by excluding $28,000 in officers' salaries where there was substantial evidence to support the Commission's reasoning that the individuals involved were closely linked to meeting the demands of common shareholders. The Supreme Court will not disturb the Commission's findings of fact which are supported by competent, material, and substantial evidence in view of the whole record and are not arbitrary or capricious.

**Am Jur 2d, Public Utilities §§ 133 et seq., 173 et seq.**

**STATE EX REL. UTILITIES COMM. v. N. C. POWER**

[338 N.C. 412 (1994)]

Justice MITCHELL dissenting in part.

Justice WEBB joins in this dissenting opinion.

Appeal by North Carolina Power pursuant to N.C.G.S. § 62-90 and N.C.G.S. § 7A-29(b) from the North Carolina Utilities Commission's Order Granting Partial Rate Increase entered on 26 February 1993 in Docket No. E-22, Subs 333 & 335. Heard in the Supreme Court 18 November 1993.

*Public Staff by A.W. Turner, Jr., and Gisele L. Rankin, Staff Attorneys, for appellee Public Staff—North Carolina Utilities Commission.*

*Michael F. Easley, Attorney General, by Margaret A. Force, Associate Attorney General, for appellee Attorney General.*

*Hunton & Williams, by Edward S. Finley, Jr. for appellant North Carolina Power.*

FRYE, Justice.

This is an appeal from an order of the North Carolina Utilities Commission (Commission) in a general rate case involving Virginia Electric and Power Company (VEPCO) which operates as North Carolina Power (NC Power) in North Carolina and Virginia Power in Virginia. NC Power is a public utility operating under the laws of North Carolina and is engaged in the generation, transmission, distribution, and sale of electricity to the public for compensation.

Procedurally this case comes to this Court as follows:

On 31 July 1992, NC Power filed an application with the Commission to adjust and increase its rates and charges for electric service to its North Carolina retail customers effective 30 August 1992. The Commission ordered that $1.39 million of the capacity costs paid by NC Power to Ultra Cogen Systems (Ultra Cogen),[1] a cogenerator, be disallowed in calculating approved North Carolina retail rates. Cogeneration involves the simultaneous production of both thermal energy, such as heat or steam, and electrical power, usually at an industrial site. By making productive use of the excess heat produced in the generation of thermal energy, cogeneration can produce elec-

---

1. Ultra Cogen Systems has been succeeded in interest by Hadson Power and later by LG&E Development. It will be referred to as Ultra Cogen in this opinion.

tricity at a reduced cost. Pursuant to section 210 of the Public Utility Regulatory Policies Act of 1978 (PURPA), regulations of the Federal Energy Regulatory Commission (FERC) promulgated thereunder, and implementation mechanisms of the states, electric utilities are required to purchase power produced by qualifying cogeneration and small power production facilities and are required to pay their "avoided costs" for the power unless another rate is negotiated.

In the spring and summer of 1986, NC Power was inundated with offers from cogenerators, that were Qualifying Facilities pursuant to federal law, to sell it electricity. In response, in December 1986, NC Power instituted a solicitation process and sent letters to potential sellers. One of NC Power's letters was sent to Ultra Cogen.

On 30 January 1987, in response to this solicitation, NC Power received proposals from Ultra Cogen to sell power from nine projects. Based on numerous factors, including cost, NC Power informed Ultra Cogen in March 1987 that it was rejecting the offer. Between 12 November 1987 and 3 December 1987, Ultra Cogen initiated arbitration proceedings with the Virginia State Corporation Commission (VSCC) seeking to arbitrate NC Power's rejection of its offer. Ultra Cogen requested the VSCC to order NC Power to enter into power purchase agreements. NC Power requested dismissal of the petitions on the ground that the VSCC had expressed its general approval of competitive bidding in a final order issued 29 January 1988. On 26 February 1988, the VSCC rejected NC Power's motion to dismiss and designated Commissioner Thomas Harwood, Jr., of the VSCC as final arbitrator of the dispute. On 30 September 1988, Commissioner Harwood ordered NC Power to execute agreements with Ultra Cogen. This order was adopted by the entire VSCC on 18 November 1988. In compliance with the VSCC's orders, NC Power executed contracts with Ultra Cogen. Additional facts will be discussed where pertinent to the issues raised by NC Power.

The questions presented on this appeal are: (1) whether the Commission's disallowance of $1.39 million in expenses for capacity payments for the Ultra Cogen cogeneration projects violates PURPA, N.C.G.S. § 62-133, or the Commerce Clause of the United States Constitution; and (2) whether the Commission's exclusion of $28,000 in officers' salaries violates N.C.G.S. § 62-133. We answer both questions in the negative and affirm the Commission's order.

STATE ex rel. UTILITIES COMM. v. N. C. POWER

[338 N.C. 412 (1994)]

I.

[1] As stated previously, section 210 of PURPA requires electric utilities to purchase power from qualifying cogeneration and small power production facilities. PURPA directs the Federal Energy Regulatory Commission (FERC) to prescribe rules to encourage cogeneration. These rules must insure that rates for such purchases shall be just and reasonable to electric consumers and in the public interest, and shall not discriminate against qualifying cogenerators. 16 U.S.C. § 824a-3(b) (1985). PURPA further requires that no rule prescribed for this purpose shall provide a rate which exceeds the incremental cost to the electric utility of alternative electric energy. *Id.* The "incremental cost of alternative electric energy" means the cost to the electric utility to produce or purchase the electric energy which, but for the purchase from such cogenerator or small power producer, the utility would generate or purchase from another source. *Id.* at § 824a-3(d). PURPA also provides that each state regulatory authority shall implement the FERC rule concerning purchases from cogenerators for each electric utility for which it has ratemaking authority. *Id.* at § 824a-3(f).

FERC regulations concerning the arrangements between electric utilities and cogenerators parallel the statutory provisions by requiring that rates for purchases shall be just and reasonable to consumers and in the public interest, and shall not discriminate against cogenerators. 18 C.F.R. § 292.304(a)(1) (1994). The regulations specifically provide that no utility is required to pay more than the avoided costs for purchases. *Id.* at § 292.304(a)(2). "Avoided costs" means the incremental costs which the utility would incur if it supplied the power itself or purchased it from another source. *Id.* at § 292.101(b)(6). The regulations further provide that they do not limit the ability of parties to negotiate agreements for rates and terms different from those called for in the regulations. *Id.* at § 292.301(b)(1). For example, a rate for cogeneration purchases may be less than the avoided costs if the state regulatory authority determines that a lower rate is consistent with the regulations and is sufficient to encourage cogeneration and small power production. *Id.* at § 292.304(b)(3). However, in April 1988, FERC held that it is impermissible for states to impose rates exceeding the avoided costs on wholesale purchases in interstate commerce. *Re Orange and Rockland Utilities, Inc.*, 92 P.U.R.4th 1, 14-15 (1988).[2]

---

2. *Orange and Rockland Utilities* reversed the FERC's earlier position in the preamble to section 210 of PURPA. In the preamble, FERC stated in pertinent part:

STATE ex rel. UTILITIES COMM. v. N. C. POWER

[338 N.C. 412 (1994)]

The United States Supreme Court has interpreted PURPA and the FERC regulations to mean that a state regulatory authority, in implementing PURPA and the federal regulations, must apply the avoided-cost rule in the absence of a waiver granted by FERC or a specific contractual agreement setting a price that is lower than the avoided cost. *American Paper Inst. v. American Elec. Power*, 461 U.S. 402, 76 L. Ed. 2d 22 (1983). Therefore, in this case, the VSCC was required to apply the avoided-cost rule in determining wholesale rates pursuant to PURPA and FERC regulations. While both parties in this case are in agreement that the avoided-cost rule is the appropriate method for determining wholesale rates pursuant to PURPA and FERC regulations, they.disagree as to what these avoided costs should have been. NC Power contends that when the VSCC set the price it had to pay Ultra Cogen for the wholesale power, the VSCC was implementing federal law and making a determination affecting wholesale power in interstate commerce. Furthermore, when the North Carolina Utilities Commission, in setting North Carolina retail rates, refused to allow NC Power to recover the $1.39 million that the VSCC required NC Power to pay Ultra Cogen, it unlawfully interfered with the VSCC's implementation of federal law. We disagree.

NC Power relies on *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 90 L. Ed. 2d 943 (1986), and *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 101 L. Ed. 2d 322 (1988), in support of its arguments that North Carolina is preempted by Virginia's decision. Those cases address the preemptive effect of a rate or apportionment set by FERC for a wholesale transaction subject to regulation under the Federal Power Act. Under FERC regulations, the purchase price for power sold by cogenerators is exempt from regulation by FERC under the relevant provisions of the Federal Power Act, 18 C.F.R. § 292.601(c), and the rate is determined under federal rules implemented by each state for utilities subject to their ratemaking authority. 18 C.F.R. §§ 292.304, 292.401(a). However, states cannot impose purchase rates in excess of avoided costs. *Re Orange and Rockland Utilites, Inc.*, 92 P.U.R.4th 1, 14-15. Therefore,

---

If a State program were to provide that electric utilities must purchase power from [qualifying facilities] at a rate higher than that provided by these rules, a qualifying facility might seek to obtain the benefits of that State program. In such a case, however, the higher rates would be based on State authority to establish such rates, and not on [FERC's] rules.

45 Fed. Reg. 12,214, 12,221 (1980).

we conclude that the Commission's disallowance of $1.39 million in expenses for capacity payments for the Ultra Cogen cogeneration projects does not violate PURPA to the extent it only excludes the amount *above* avoided costs.

We must now compare the VSCC's determination of avoided costs with the Commission's determination of avoided costs.

## A. The VSCC's Measure of Avoided Costs

[2] On 27 April 1988, Commissioner Harwood ruled that Ultra Cogen was entitled to receive avoided cost payments determined as of 12 November 1987, the date Ultra Cogen began to file arbitration petitions with the VSCC. The Virginia arbitrator further concluded that the avoided cost payments should be based on NC Power's costs of constructing and operating a gas-fired facility called Chesterfield Unit No. 7, which is intended to be the prototype for any new facility built through the mid-1990's.

In an interim order of 27 May 1988, Commissioner Harwood specified various "key terms and conditions that should be included in a power purchase agreement between the parties." These terms and conditions included the determination that the capacity price for each of the Ultra Cogen projects at issue shall be $341.23 per dependable kilowatt for the first fifteen years of operation and $189.70 for years sixteen through twenty-five. In a final order dated 30 September 1988, he ordered NC Power to execute agreements with Ultra Cogen including these terms. This order was adopted by the entire VSCC on 18 November 1988. In compliance with the VSCC's orders, NC Power executed contracts with Ultra Cogen. NC Power did not exercise its right to appeal the VSCC's order and it did not file the contracts with the North Carolina Utilities Commission. During the test year in this case, NC Power paid Ultra Cogen $2.8 million on a North Carolina retail allocation basis for capacity payments under these contracts.

## B. The Commission's Measure of Avoided Costs

On 26 February 1993 the Commission entered an order granting a partial rate increase finding that it was not bound by the actions of the VSCC with regard to the Ultra Cogen contracts and concluding that it was appropriate to reduce operation and maintenance expenses by $1.39 million to reflect the removal of unreasonable capacity costs.

STATE EX REL. UTILITIES COMM. v. N. C. POWER

[338 N.C. 412 (1994)]

The Commission compared the Ultra Cogen contracts to the results of the 1986 and 1988 competitive bidding solicitations and determined that the rates in the Ultra Cogen contracts exceeded NC Power's avoided costs at the time the arbitration petitions were filed. The 1986 solicitation, which used NC Power's proposed Chesterfield No. 7 as a benchmark, produced average capacity costs of $141 per dependable kilowatt compared to $341 per dependable kilowatt for the Ultra Cogen projects. The evidence showed that the 1986 projects were expected to operate at a 32.2 percent capacity factor compared to 27.1 percent for the Ultra Cogen projects, thus eliminating any justification for the higher capacity costs on the basis of lower energy costs.

The Commission noted that the Virginia arbitrator himself stated in a February 1990 order that payments for the Doswell projects (from the 1986 solicitation) were based on the avoided costs of Chesterfield No. 7 and were reasonable. The Doswell projects and the Ultra Cogen projects came on-line within a few months of one another (Doswell on 3 May and 10 May 1992 and Ultra Cogen on 22 February, 7 March, and 1 July 1992). The capacity cost for the Doswell projects is $146 per dependable kilowatt, while the capacity cost for the Ultra Cogen projects is $341 per dependable kilowatt. Furthermore, the Ultra Cogen projects' average capacity factor, based on economic dispatch, is approximately one-half that of the Doswell projects' average capacity factor, which indicates the Ultra Cogen projects' energy costs are greater.

The seven projects that were selected in the 1988 solicitation and were operational at the time of the hearing, have an average capacity cost of $171 per dependable kilowatt and a combined capacity factor of 35.9 percent. The Commission used the average capacity costs from the 1988 solicitation as a proxy for what the 1986 solicitation results would have been if the 1986 solicitation had occurred at the time the Ultra Cogen contracts were signed. Using the results of the later solicitation did not prejudice NC Power, but rather allowed it to include $30 per dependable kilowatt (or $240,000) more in rates than if the 1986 results were used.

We conclude that it was not unreasonable for the North Carolina Utilities Commission to use the competitive bidding measure in determining avoided costs, thereby rejecting the measure used by the VSCC. In fact, NC Power argued before the VSCC that competitive bidding should be the measure used. The North Carolina Utilities

IN THE SUPREME COURT 421

STATE ex rel. UTILITIES COMM. v. N. C. POWER

[338 N.C. 412 (1994)]

Commission carefully reviewed the capacity rate set by the Virginia arbitrator's decision and found that he did not properly take into account other potential sources of power. Thus, the Virginia arbitrator greatly overestimated NC Power's avoided costs. The North Carolina Utilities Commission's exclusion of $1.39 million in expenses for capacity payments for the Ultra Cogen cogeneration projects is nothing more than the disallowance of the amount by which the contract rate exceeded NC Power's avoided costs. Therefore, there is no violation of PURPA.

[3] Next, we address the question of whether the Commission's disallowance of $1.39 million in expenses for capacity payments violates N.C.G.S. § 62-133. Section 62-133(b)(3) provides that the Commission shall determine a utility's "reasonable operating expenses" when setting rates. NC Power contends that the Commission, contrary to North Carolina law, arbitrarily decided that the rates paid Ultra Cogen were too high. NC Power also argues that the Commission, in deciding the reasonableness of operating expenses, must determine whether management has acted prudently. We disagree.

This Court rejected this argument in *State ex rel. Utilities Comm'n v. Carolina Power & Light Co.*, 320 N.C. 1, 358 S.E.2d 35 (1987), reasoning that:

> [A]lthough management prudence may be an important factor considered by the Commission in a general rate case, management prudence *vel non* does not control the Commission's decision as to whether to adjust test period data to reflect abnormalities having a probable impact on the utility's revenues and expenses during the test period, in order that it may set reasonable rates in compliance with N.C.G.S. § 62-133.

*Id.* at 12, 358 S.E.2d at 41. The conclusion that management imprudence is only one method of demonstrating that a given expense is unreasonable is also consistent with the standard applied in *State ex rel. Utilities Comm'n v. Intervenor Residents*, 305 N.C. 62, 286 S.E.2d 770 (1982). In *Intervenor Residents*, we held that the Commission must always determine that expenses paid to affiliated companies are reasonable. "If there is an absence of data and information from which either the propriety of incurring the expense or the reasonableness of the cost can readily be determined, the Commission may require the utility to prove [its] propriety and reasonableness by affirmative evidence." *Id.* at 75, 286 S.E.2d at 778.

The findings of the Commission, when supported by competent evidence, are conclusive. *State ex. rel. Utilities Comm'n v. Thornburg*, 325 N.C. 484, 385 S.E.2d 463 (1989). In this case, the Commission reviewed the capacity rate set by the Virginia arbitrator and determined that he did not properly take into account other potential sources of power. Thus, his assessment of avoided costs was unreasonably high. The Commission's exclusion of $1.39 million in expenses for capacity payments was merely the disallowance of the amount by which the contract rate exceeded NC Power's avoided costs. Therefore, we conclude that the Commission properly disallowed expenses for unreasonably high payments to Ultra Cogen in accordance with N.C.G.S. § 62-133.

[4] Another issue raised by NC Power is whether the Commission's disallowance of these expenses violates the Commerce Clause of the United States Constitution. Under Article I, Section 8 of the U.S. Constitution, Congress shall have the power "[t]o regulate Commerce . . . among the several States . . . ." In *FERC v. Mississippi*, 456 U.S. 742, 72 L. Ed. 2d 532, *reh'g denied*, 458 U.S. 1131, 73 L. Ed. 2d 1401 (1982), the Court determined that Congress has the power under the Commerce Clause to regulate the relationships between cogenerators and electric utilities in order to protect interstate commerce. Under PURPA, federal law specifically requires each state to implement federal guidelines for each utility whose rates it regulates. 16 U.S.C. § 824a-3(f). Thus, the Commission is authorized by Congress to act with regard to arrangements between cogenerators and NC Power. The Commission's disallowance of the amount by which the Ultra Cogen contracts exceeded NC Power's avoided costs is consistent with PURPA and the FERC's regulations and constitutes lawful retail ratemaking. The Commission's actions here do not violate the Commerce Clause.

While we recognize that inconsistent determinations of avoided costs by the VSCC and the Commission may burden NC Power, we believe this burden is a necessary consequence of doing business in more than one state. Here, NC Power believed that the capacity rate set by the Virginia arbitrator and ultimately adopted by the VSCC was higher than required by federal law. In fact, NC Power argued before the VSCC that the competitive bidding method should have been used in determining avoided costs. However, instead of appealing the adverse decision of the VSCC to the Virginia courts, NC Power accepted the VSCC decision which required it to pay a rate in excess of avoided costs. NC Power thus accepted the risk that the North

Carolina Utilities Commission might not permit it to recover the excess amount from its North Carolina consumers.

II.

**[5]** Finally, we address the question of whether the Commission's exclusion of $28,000 in officers' salaries violates N.C.G.S. § 62-133. NC Power argues that absent a showing that such salaries are unreasonable or will not actually be incurred, there was no basis for the exclusion of these expenses. We disagree.

One of the critical elements of the ratemaking process is a determination of what expenses are appropriate for inclusion in rates. *State ex rel. Utilities Comm'n v. Eddleman*, 320 N.C. 344, 358 S.E.2d 339 (1987), and *State ex rel. Utilities Comm'n v. Public Staff*, 317 N.C. 26, 343 S.E.2d 898 (1986). The Commission argues that it is the policy of the Commission to make executive salary adjustments. *See In re Application of Duke Power Co.*, 75 NCUC Report 298 (1985). In *Application of Duke Power Co.*, the Commission concluded that Duke Power's shareholders should bear fifty percent of the overall compensation of those officers whose functions are most closely linked with meeting the demands of the common shareholders. *Id.* The Commission has reached the same conclusion in subsequent rate cases. *See, e.g., In re Application of Duke Power Co.*, 76 NCUC Report 279 (1986), and *In re Application of Carolina Power & Light Co.*, 77 NCUC Report 272 (1987).

In the present case, the Public Staff proposed to remove fifty percent of the salaries of NC Power's President/Chief Executive Officer, the Chairman of the Board of Directors, and the President/Chief Executive Officer of NC Power's sole common stockholder, Dominion Resources, Inc. The Commission concluded that the Public Staff adjustment to exclude fifty percent of the compensation of the three officers in question was appropriate, explaining its reasons for making the executive salary adjustments:

> Witness Maness testified that these three individuals are closely linked to meeting the demands of the Company's common share-holders. All three serve on the VEPCO Board of Directors, as well as the Dominion Resources, Inc. Board of Directors. The Chairman of the VEPCO Board is also the Chairman of the Dominion Resources, Inc. Board, as well as the boards of Dominion Resources, Inc.'s other subsidiaries, Dominion Capital, Dominion Energy, and Dominion Lands. Witness Maness testified that

STATE ex rel. UTILITIES COMM. v. N. C. POWER

[338 N.C. 412 (1994)]

this adjustment is especially appropriate for VEPCO given the nature of Dominion Resources, Inc.'s non-regulated business interests. Witness Maness stated that the interests of Dominion Resources, Inc. as they relate to its non-regulated businesses may not always coincide with the interests of VEPCO's retail ratepayers. Witness Maness also testified that the Commission has adopted an adjustment consistent with his approach in each of the seven Duke, CP&L, and VEPCO general rate cases decided since November 1984.

This Court will not disturb the Commission's findings of fact which are supported by competent, material, and substantial evidence in view of the whole record and are not arbitrary or capricious. *State ex rel. Utilities Comm'n v. Thornburg*, 325 N.C. 484, 385 S.E.2d 463 (1989). The authority to regulate the rates of public utilities lies with the Commission and a reviewing court may not modify or reverse its determination merely because the court would have reached a different finding based on the evidence. *State ex rel. Utilities Comm'n v. Eddleman*, 320 N.C. 344, 358 S.E.2d 339 (1987). After reviewing the entire record, we conclude that there is substantial evidence to support the Commission's salary adjustments in this case.

For the foregoing reasons, the Commission's order of 26 February 1993 is affirmed.

AFFIRMED.

Justice MITCHELL dissenting in part.

It is my belief that when the Virginia State Corporation Commission (VSCC) set the price that North Carolina Power (NC Power) must pay Ultra Cogen Systems (Ultra Cogen) for wholesale power, the VSCC was implementing federal law and entering an order affecting wholesale power in interstate commerce. Accordingly, I conclude that when the North Carolina Utilites Commission (NCUC), while setting North Carolina retail rates, refused to allow NC Power to recover the $1.39 million that the VSCC had ordered NC Power to pay Ultra Cogen, it unlawfully interfered with the VSCC's implementation of federal law. Therefore, I dissent from the decision of the majority to the extent that it affirms the NCUC's refusal to allow NC Power to recover the $1.39 million of costs it actually incurred by complying

with the VSCC's order requiring it to purchase power from Ultra Cogen.

Under procedures established by federal law, Ultra Cogen applied to the VSCC for an order requiring NC Power to purchase wholesale power from Ultra Cogen and setting the price NC Power would pay for that power. Congress has concluded that wholesale power transactions affect interstate commerce and shall be regulated by the Federal Energy Regulatory Commission (FERC) under the Federal Power Act. As a cogenerator qualifying facility selling wholesale power, Ultra Cogen's sales of wholesale power are controlled by the Federal Public Utility Regulatory Policies Act of 1978 (PURPA). 16 U.S.C. § 828a-3 (1985). By enacting PURPA, Congress has delegated to the states, under mandatory guidelines established by the FERC, authority over wholesale transactions involving cogenerators, such as the transaction between Ultra Cogen and NC Power at issue in the present case. As a result, when VSCC set the price NC Power must pay Ultra Cogen for the wholesale power at issue here, the VSCC was implementing federal law and making a determination affecting wholesale power in interstate commerce. The VSCC was making a determination which, but for the provisions of PURPA, would have been made exclusively by FERC; that determination was the functional and legal equivalent of an order by the FERC setting the price. For that reason, when the NCUC refused to allow NC Power to recover the $1.39 million in annual capacity costs it had actually incurred as a result of the VSCC order, the NCUC unlawfully interfered with the VSCC's implementation of federal law. In my view, the NCUC's actions were preempted by federal law and must be reversed by this Court.

The Supremacy Clause of the Constitution of the United States subordinates the legislative and administrative acts of the individual states to those of the United States.

Pre-emption occurs when Congress, in enacting a Federal statute, expresses a clear intent to pre-empt state law when there is outright or actual conflict between Federal and state law, where compliance with both Federal and state law is in effect physically impossible, where there is implicit in Federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the states to supplement Federal law, or where the state law stands as an obstacle to the accomplishment and execution of the

full objectives of Congress. Pre-emption may result not only from action taken by Congress itself; a Federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation.

*Louisiana Public Service Comm. v. Federal Communications Comm.*, 476 U.S. 355, 368-69, 90 L. Ed. 2d 369, 381-82 (1986) (citations omitted). I believe that the doctrine of preemption embodied in the Supremacy Clause precludes the order entered by the NCUC and affirmed by the majority of this Court in the present case.

PURPA was adopted in 1978 as part of the National Energy Act. *Federal Energy Regulatory Comm. v. Mississippi*, 456 U.S. 743, 745, 72 L. Ed. 2d 532, 537-38 (1982). PURPA represented a response to rapidly fluctuating conditions, including an anticipation of impending shortages of essential non-renewable forms of energy. *Id.* It was intended to advance a national policy of energy conservation. *Id.* Section 210 of Title II of PURPA dealing with cogeneration was part of a broad federal statute that also set standards for retail rates for electric utilities. *Id.* Section 210 was intended to promote the development of qualified cogeneration facilities in order to reduce the demand for traditional fossil fuels. *Id.* at 750, 72 L. Ed. 2d at 541.

PURPA expressly requires the FERC to "prescribe, and from time to time thereafter revise, such rules as it determines necessary to encourage cogeneration and small power production." 16 U.S.C. § 824a-3(a) (1985). The FERC is specifically required to promulgate rules requiring electric utilities to "sell electric energy to qualifying cogeneration facilities" and to "purchase electric energy from such facilities." 16 U.S.C. § 824a-3(a)(1)-(2) (1985).

In 1980, pursuant to the requirement of Section 210(a) of PURPA, the FERC issued a series of regulations further defining federal cogeneration law and policy. Section 292.303(a) of the regulations imposes a federal obligation on electric utilities to purchase power from qualifying facilities; "each electric utility shall purchase, in accordance with [18 C.F.R. § 292.304], any energy and capacity which is made available from a qualifying facility: (1) directly to the electric utility . . . ." 18 C.F.R. § 292.303(a) (1992). Acting under PURPA, the FERC provided that a rate for such purchases satisfies the just, reasonable, and public interest requirement for PURPA rates if the rate equals the "avoided costs" of a utility. The FERC required that avoided costs must be derived through a mandatory consideration of

specific factors. These factors include the anticipated reliability of the qualifying facility. 18 C.F.R. § 202.304(b)(2), (b)(4); (e) (1992). The FERC has also provided that such rates may be less than avoided costs "if the State regulatory authority . . . determines that a lower rate is consistent with [the just, reasonable, and public interest requirement] and is sufficient to encourage cogeneration." 18 C.F.R. § 292.304(b)(3) (1992).

The FERC regulations also contain additional provisions for establishing rates to be paid to qualifying facilities. They provide that the cogenerator shall, at its option, provide energy or capacity "pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term." 18 C.F.R. § 292.304(d)(2) (1992). If the qualifying facility so decides, "the rates for such purchases shall, at the option of the qualifying facility exercised prior to the beginning of the specified term, be based on either: (i) The avoided costs calculated at the time of delivery; or (ii) The avoided costs calculated at the time the obligation is incurred." *Id.*

The profound effect of PURPA on state authority is demonstrated by the FERC's comments to its 1980 regulations. There, the FERC determined that efficient use of fuels allowed cogeneration facilities to "make a significant contribution to the Nation's effort to conserve its energy resources." 45 Fed. Reg. 12,215 (1980). The FERC further concluded that Section 210 was designed to remove former obstacles to the growth of cogeneration, one of which was that utilities were not generally required to purchase the power produced by a cogenerator at an appropriate rate. *Id.* Under Section 210, each electric utility would be required "to offer to purchase available electric energy from cogeneration and small production facilities." *Id.*

The FERC also has determined that PURPA requires cooperation between the federal government and the states. Implementation of PURPA is reserved to state regulatory authorities and non-regulated entities. 45 Fed. Reg. 12,216 (1980). In this context, the FERC has determined that "implementation means enforcing the federal obligation on electric utilities to purchase power at avoided cost rates" which expressly requires a determination of "the rate for purchases at a level . . . appropriate to encourage cogeneration." 45 Fed. Reg. 12,221 (1980). Therefore, "[s]tate laws or regulations which would provide rates lower than the Federal standards would fail to provide the requisite encouragement of these technologies, and must yield to Federal law." *Id.* The states' obligation to follow federal rate law is

STATE ex rel. UTILITIES COMM. v. N. C. POWER

[338 N.C. 412 (1994)]

also reflected in the FERC's determination that when a facility "shows that it requires rates for purchases based on full avoided costs to remain viable, or to increase its output, the State regulatory authority . . . is required to establish such rates." 45 Fed. Reg. 12,223 (1980).

It was within the context of the foregoing federal statutes and regulations that the VSCC made its determination that NC Power must purchase wholesale power from Ultra Cogen at the prices the VSCC established. No one has questioned the jurisdiction of the VSCC to hear the dispute or to enter its decision. Ultra Cogen went to the VSCC rather than the NCUC because the wholesale sales at issue were to take place in Virginia. Once the VSCC entered its ruling, the obligation of NC Power to purchase wholesale power from Ultra Cogen and the price of that wholesale power were established by federal law. From that point on, neither the NCUC nor any other state agency was free to establish a different price that NC Power must pay Ultra Cogen for the wholesale power, even though it was to be resold in North Carolina. Certainly, NC Power was not required to pay Ultra Cogen different prices for the wholesale power purchased depending on the state in which NC Power resold that power. In my view, the NCUC was without authority to indirectly subvert the VSCC's decision by refusing to permit NC Power to recover the amounts it had been forced to pay involuntarily to Ultra Cogen for the power in question by virtue of VSCC's order. Further, I do not share the apparent view of the majority, as expressed in footnote 2 of its opinion, that the failure of NC Power to devote the time and resources necessary to appealing the decision the VSCC had entered over NC Power's strong objections and contentions somehow amounted to acceptance of that decision by NC Power. NC Power was entitled, in my view, to assume that the NCUC would honor the ruling of the VSCC applying federal law.

In *Federal Energy Regulatory Commission v. Mississippi*, the Supreme Court of the United States recognized the preemptive effect of PURPA and rejected a constitutional challenge to Section 210 of PURPA. The Supreme Court recognized that the statute used "state regulatory machinery to advance federal goals," and therefore presented unusual preemption issues. *Federal Energy Regulatory Comm. v. Mississippi*, 456 U.S. at 759, 72 L. Ed. 2d at 546. The Supreme Court expressly stated in this context that "state courts have a unique role in enforcing the body of federal law," and that "state courts were directed to heed the constitutional command that 'the policy of the [F]ederal Act is the prevailing policy in every state

. . . and should be respected accordingly in the courts of the State.' "
*Id.* at 760, 72 L. Ed. 2d at 547 (quoting *Testa v. Katt,* 330 U.S. 386, 392-
93, 91 L. Ed. 967, 972 (1947) and *Mondou v. New York, N.H. & H.R.
Co.,* 223 U.S. 1, 57, 56 L. Ed. 327, 349 (1912)). The Supreme Court went
on to state that:

> Any other conclusion would allow the States to disregard both
> the pre-eminent position held by Federal law throughout the
> Nation . . . and the congressional determination that the Federal
> rights granted by PURPA can appropriately be enforced through
> state adjudicatory machinery. Such an approach, *Testa* empha-
> sized, "flies in the face of the fact that the States of the Union con-
> stitute a nation," and "disregards the purpose and effect of Article
> IV of the Constitution."

*Id.* at 760-61, 72 L. Ed. 2d at 548 (citations omitted).

In my view, the decision of the NCUC and the opinion of the
majority here conflict with the decision of the Supreme Court of the
United States in *Federal Energy Regulatory Commission v. Missis-
sippi,* to the extent that they conclude that the preemption doctrine
does not apply and that the order entered by the NCUC was permis-
sible under PURPA. When a state agency purports to carry out the
intent of PURPA, it must follow federal law. When the VSCC entered
its order requiring NC Power to buy power from Ultra Cogen and set-
ting the price NC Power had to pay for that power, it was enforcing
PURPA, the applicable federal law. When the NCUC disregarded the
order entered by the VSCC, it prevented the VSCC's lawful order
enforcing the controlling federal law established by PURPA and vio-
lated the Supremacy Clause. The NCUC assumed total control over
the valuation of costs related to PURPA-mandated purchases of elec-
tric power, despite the decision by the VSCC implementing PURPA
and despite NC Power's clear federal obligation to pay Ultra Cogen
the amount set by the VSCC for the power NC Power was required to
purchase over its strenuous objections from Ultra Cogen. The error of
the NCUC in entering its order is emphasized by its statement in deny-
ing more than $1.39 million in annual costs, that "we recognize our
[federal] obligation to encourage [qualified cogeneration facilities],
but that is not the issue here." I do not believe that the NCUC can so
easily avoid the requirements of PURPA by simply asserting that they
do not apply. I believe that the exclusion of recovery for purchased
capacity costs such as those at issue here is directly related to the

**CITY OF NEW BERN v. NEW BERN-CRAVEN CO. BD. OF EDUC.**

[338 N.C. 430 (1994)]

federal mandate of encouragement of qualifying facilities to produce electric power and conserve the electric resources of this nation.

Because I believe that in determining the amount NC Power must pay Ultra Cogen under PURPA, the VSCC lawfully applied the federal law preempting the field, I believe that the determination of the VSCC had a preemptive effect equivalent to the preemptive effect of FERC orders establishing wholesale rates. That being the case, the VSCC order was binding on the NCUC under the theory of preemption. *See Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 101 L. Ed. 2d 322 (1988) (rates mandated by FERC held preemptive); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 90 L. Ed. 2d 943 (1986) (same). In my view, the action of the NCUC was preempted by PURPA and by the essentially federal act of the VSCC in establishing the wholesale price that NC Power must pay Ultra Cogen for the power it acquired for resale to its retail consumers. Therefore, I dissent from that part of the decision of the majority holding to the contrary.

Justice WEBB joins in this dissenting opinion.