IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-1203

Filed: 17 December 2019

North Carolina Utilities Commission, Nos. E-2, Sub 1177; E-7, Sub 1172

IN THE MATTER OF CUBE YADKIN GENERATION, LLC, Complainant

v.

DUKE ENERGY PROGRESS, LLC, Respondent

Appeal by Complainant from Order entered 16 July 2018 by the North Carolina Utilities Commission. Heard in the Court of Appeals 8 August 2019.

> *Kilpatrick Townsend & Stockton LLP, by Joseph S. Dowdy, Benjamin L. Snowden, and Phillip A. Harris, Jr., for complainant-appellant.*

> *The Allen Law Offices, by Dwight W. Allen, Britton H. Allen, and Brady W. Allen, and Kendrick Fentress, Associate General Counsel of Duke Energy Corporation, for respondent-appellee.*

HAMPSON, Judge.

## **Factual and Procedural Background**

Cube Yadkin Generation, LLC (Cube) is a limited liability company that acquires, develops, and modernizes hydroelectric facilities. The present dispute arises out of Cube's purchase of hydroelectric facilities (the Yadkin Project)[1] from Alcoa Power Generating, Inc. (Alcoa) on 1 February 2017 and Cube's efforts to sell

---

[1] The Yadkin Project consists of four hydroelectric facilities; however, the parties agree only three of these facilities are in dispute. Therefore, for ease of reading, the Yadkin Project, as used in this opinion, refers only to the three disputed facilities.

electrical power generated by these facilities to Duke Energy Progress, LLC (Duke). In this appeal, Cube appeals from the Order Granting Motion to Dismiss (Order) entered on 16 July 2018 by the North Carolina Utilities Commission (Commission), dismissing Cube's Verified Complaint, Request for Declaratory Ruling, and Request for Arbitration (Complaint) against Duke. The Record tends to show the following:

In 1978, Congress enacted the Public Utility Regulatory Policies Act of 1978 (PURPA), which sought, *inter alia*, to encourage a national policy of energy conservation. *See FERC v. Mississippi*, 456 U.S. 742, 745, 72 L. Ed. 2d 532, 537-38 (1982). "Pursuant to section 210 of [PURPA], regulations of the Federal Energy Regulatory Commission (FERC) promulgated thereunder, and implementation mechanisms of the states, electric utilities are required to purchase power produced by qualifying cogeneration and small power production facilities [(collectively, Qualifying Facilities)] and are required to pay their 'avoided costs' for the power unless the rate is negotiated." *State ex rel. Utilities Comm. v. N.C. Power*, 338 N.C. 412, 416, 450 S.E.2d 896, 898 (1994); *see also* 16 U.S.C.A. § 824a-3(d) (West 2010) (defining avoided cost as "the cost to the electric utility of the electric energy which, but for the purchase from such [Qualifying Facilities], such utility would generate or purchase from another source"). Under FERC regulations, a Qualifying Facility can sell its power pursuant to a Legally Enforceable Obligation and can choose to fix the

price "at the time the [Legally Enforceable Obligation] is incurred" or at the moment of delivery. 18 C.F.R. § 292.304(d)(2)(i)-(ii) (2019).

Prior to 2016, the Commission applied a two-part test for determining the establishment of a Legally Enforceable Obligation. *See* N.C. Utils. Comm'n, *Order Establishing Standard Rates and Contract Terms for Qualifying Facilities*, Docket No. E-100, Sub 140, at *52 (Dec. 17, 2015) [hereinafter *Sub 140 Order*]. The Commission required a Qualifying Facility to (1) obtain a Certificate of Public Convenience and Necessity (CPCN)[2] and (2) indicate to the utility that it was "seeking to commit itself to sell its output[.]" N.C. Utils. Comm'n, *Order Establishing Standard Rates and Contract Terms for Qualifying Facilities*, Docket No. E-100, Sub 136, at *37 (Feb. 21, 2014) [hereinafter *Sub 136 Order*]; *see also* N.C. Gen. Stat. § 62-110.1(a) (2017) (requiring a CPCN from the Commission before "construction of any . . . facility for the generation of electricity"). However, because this second prong was vague and difficult to establish, the Commission later created the Notice of Commitment (NOC) Form, demonstrating a Qualifying Facility's commitment to sell its output. *Sub 140 Order*, at *51-52. Effective 26 January 2016, the Commission thus revised its Legally-Enforceable-Obligation test, ordering that for a Qualifying Facility to establish a Legally Enforceable Obligation, the developer of the Qualifying

---

[2] If the Qualifying Facility was under 2 megawatts, the Qualifying Facility filed a Report of Proposed Construction instead of a CPCN; however, none of Cube's Qualifying Facilities were under 2 megawatts.

Facility was required to: "(1) have self-certified with the FERC as a [Qualifying Facility]; (2) have made a commitment to sell the facility's output to a utility pursuant to PURPA via the use of [the NOC Form;] and (3) have received a CPCN for the construction of the facility." *Sub 140 Order*, at *52. Indeed, relevant to this appeal, Section Three of the NOC Form specifically requires a Qualifying Facility to indicate whether it has applied for or received a CPCN from the Commission.

According to Cube's Complaint, the Yadkin Project facilities have been in operation since at least 1958. In 2000, Alcoa acquired the Yadkin Project, and on 22 September 2016, FERC issued a new long-term license to Alcoa for the Yadkin Project, allowing for the operation and maintenance of the Yadkin Project until 31 March 2055. On 30 June 2016, Cube signed a contract with Alcoa to acquire the Yadkin Project, and approximately a month later, Cube submitted an application to FERC seeking approval of the transfer of Alcoa's Yadkin Project license. FERC approved the transfer on 13 December 2016. Cube "formally consummated its agreement to purchase the Yadkin Project" on 1 February 2017. Prior to this transfer, Alcoa self-certified the Yadkin Project as Qualifying Facilities by filing Form 566s with FERC on 28 September 2016, and on 16 March 2017, Cube filed Form 566s with FERC, self-recertifying the Yadkin Project as Qualifying Facilities.

In March 2016, Cube, as part of its due diligence process, contacted Duke to introduce itself and begin inquiries about entering into a Power Purchase Agreement

(PPA) with Duke. The parties subsequently held an in-person meeting to discuss entering into "a potential long-term PPA for the [Yadkin Project Qualifying Facilities]." Cube and Duke continued discussions, and by letter dated 21 September 2016, Duke stated:

> You [(a representative for Cube)] informed me that [Cube] does not currently own or operate the Yadkin [Project] system, but anticipates that it will close on the transaction to own and operate the facilities around November 1, 2016. As I communicated to you previously, Duke does not have any current needs for energy or capacity . . . . You further informed me that [Cube] is considering certifying the [Yadkin Project] as [Q]ualifying [F]acilities under [PURPA]. In that regard, I informed you that to the extent [Cube] approached Duke under PURPA, that under PURPA's requirements, Duke would likely have no obligation to purchase any output of energy or capacity from the Yadkin [Project] system units that may be certified as [Q]ualifying [F]acilities.

On or about 11 October 2016, Cube sent Duke a letter in response, indicating Alcoa had self-certified the Yadkin Project, stating PURPA "require[s] electric utilities, including Duke, to purchase energy and capacity made available from [Qualifying Facilities,]" and requesting the parties meet "to discuss the process for making sales from [the Yadkin Project] to Duke pursuant to PURPA." Countering Cube's assertions, Duke replied by letter dated 14 October 2016, stating because Cube "neither owns nor is a [Q]ualifying [F]acility with respect to the Yadkin [Project,]" Cube had no rights to exert under PURPA. Duke further asserted its position that

even if Cube eventually acquired the Yadkin Project and rights under PURPA, Duke would be exempted from any purchase obligation under PURPA.

Duke, however, did represent to Cube "it would enter into good faith negotiations . . . concerning the purchase of the output of the Yadkin [Project] facilities on a non-PURPA basis."[3]  These discussions began in November 2016 and continued until 10 August 2017; however, the parties never reached a non-PURPA agreement.  According to Cube, "Duke's conduct since the beginning of the discussions between the parties appears to have been designed to discourage [Cube] from pursuing its rights under PURPA."  Importantly, on 15 November 2016, Duke filed its "2016 Avoided Cost Proposal" with the Commission, which, Cube claimed, "would have the impact of dramatically reducing the utilities' avoided costs, and, therefore, rates offered to [Qualifying Facilities under PURPA]."

On 29 March 2018, Cube filed its Complaint against Duke, seeking to enforce its right under PURPA to sell the energy from the Yadkin Project to Duke at the avoided-cost rates as of the date it first established its Legally Enforceable Obligation.  Cube asserted the Yadkin Project was self-certified as Qualifying Facilities by Alcoa on 28 September 2016, which certification "attach[ed] to the facility[.]"  Cube also asserted it was not required to file the NOC Form because Cube was not required to obtain a CPCN and thus could not make this certification on the

---

[3] According to FERC regulations, utilities and Qualifying Facilities are free to enter into negotiations for non-PURPA rates.  *See* 18 C.F.R. 292.301(b)(1) (2019).

NOC Form. Specifically, Cube's position was the CPCN requirement was not applicable because the statute creating the CPCN requirement was enacted *after* the Yadkin Project had already been constructed and in operation. Cube therefore contended its communications with Duke in September and October established its "commitment to sell the output of the [Yadkin Project] facilities to Duke."

Thus, Cube contended it established a Legally Enforceable Obligation, at the latest, by 11 October 2016, thereby entitling it to the higher avoided-cost PURPA rates effective on that date rather than the lower avoided-cost rates established by Duke's 15 November 2016 Avoided Cost Proposal. Although Cube asserted the Commission's three-part test was inapplicable because of Cube's unique situation, Cube nevertheless argued it had "substantially complied with the substance of the requirement[s]" and requested the Commission waive the three-part test. In addition, Cube alleged Duke acted in bad faith during negotiations by claiming it was exempt from its PURPA requirements to buy Cube's energy, which Cube contended further supported a waiver of the three-part test.

On 7 May 2018, Duke filed its Joint Answer and Motion to Dismiss Complaint of Cube Yadkin Generation, LLC (Motion to Dismiss). In its Motion to Dismiss, Duke disagreed with Cube's contentions and asserted Cube failed to establish a Legally Enforceable Obligation prior to the change in its avoided-cost rates because of Cube's noncompliance with the Commission's three-part test. Therefore, Duke sought

dismissal of Cube's Complaint for failure to state a claim upon which relief could be granted.

On 16 July 2018, the Commission issued its Order granting Duke's Motion to Dismiss. The Commission concluded Cube did not establish a Legally Enforceable Obligation prior to 15 November 2016—the date Duke's avoided-cost rates changed— because "[t]he undisputed facts demonstrate that [Cube] did not transmit the [NOC] Form . . . to make a commitment to sell the output of the [Yadkin Project facilities] to [Duke]."[4] Regarding Cube's waiver request, the Commission then addressed the "novel issue" of whether Cube, "as the owner of [Qualifying Facilities] that were constructed prior to the enactment of [the statute requiring a CPCN], should be relieved from the required use of the [NOC] Form in demonstrating a commitment to sell the output of the [Yadkin Project facilities] to [Duke]." After "weigh[ing] equitable considerations, state policy, and considerations of judicial economy in determining whether [Cube] should be granted a waiver of the required use of the [NOC] Form[,]" the Commission denied Cube's request to waive the NOC Form requirement.[5] Cube filed timely Notice of Appeal from the Commission's Order. *See*

---

[4] The Commission did not address whether either of the two additional requirements of the three-part test were satisfied; rather, the Commission assumed, without deciding, Cube met these requirements and rested its decision solely on Cube's failure to submit the NOC Form.

[5] Two Commissioners wrote separate dissents arguing the Commission erred in dismissing the Complaint because Cube had stated a claim upon which relief could be granted and that "a material issue of fact, among others, remains, *i.e.*, whether a legally enforceable obligation (LEO) was established in 2016 by each of [Cube's Qualifying Facilities] that are the subject of the Complaint[.]"

N.C. Gen. Stat. § 62-90(a), (d) (2017) (allowing a party to appeal as of right any final order of the Commission and directing that "[t]he appeal shall lie to the appellate division . . . as provided in" Section 7A-29 of our General Statutes); *see also* N.C. Gen. Stat. § 7A-29(a) (2017) (directing in non-general-rate cases, "appeal as of right lies directly to the Court of Appeals").

## Issues

The dispositive issues on appeal are whether: (I) the Commission erred in ruling Cube failed to establish a Legally Enforceable Obligation by not submitting the NOC Form and (II) the Commission erred in determining, at the motion-to-dismiss stage in the litigation, Cube was not entitled to a waiver of the NOC Form requirement.

## Standard of Review

As our Supreme Court has recognized, "[t]he decision of the Commission will be upheld on appeal unless it is assailable on one of the statutory grounds enumerated in [N.C. Gen. Stat. §] 62-94(b)." *State ex rel. Util. Comm'n v. Carolina Util. Customers Ass'n*, 348 N.C. 452, 459, 500 S.E.2d 693, 699 (1998) (citation omitted). Subsection 62-94(b) provides:

> (b) So far as necessary to the decision and where presented, the court shall decide all relevant questions of law, interpret

---

According to these two dissents, the failure to submit the NOC Form was not fatal, and the Commission had discretion to decide whether to waive this requirement. Further, both dissenting Commissioners agreed the Commission's rejection of Cube's waiver argument was particularly inappropriate at such an early stage in the proceedings, based solely on the pleadings.

constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action. The court may affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:

    (1)    In violation of constitutional provisions, or

    (2)    In excess of statutory authority or jurisdiction of the Commission, or

    (3)    Made upon unlawful proceedings, or

    (4)    Affected by other errors of law, or

    (5)    Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or

    (6)    Arbitrary or capricious.

N.C. Gen. Stat. § 62-94(b) (2017). "Under [Section 62-94], the essential test to be applied is whether the Commission's order is affected by errors of law or is unsupported by competent, material, and substantial evidence in view of the entire record as submitted." *State ex rel. Utilities Comm. v. Village of Pinehurst*, 99 N.C. App. 224, 226, 393 S.E.2d 111, 113 (1990) (citations omitted), *aff'd per curiam*, 331 N.C. 278, 415 S.E.2d 199 (1992). Yet, "any . . . finding, determination, or order made by the Commission . . . shall be prima facie just and reasonable." N.C. Gen. Stat. § 62-94(e).

## Analysis

Duke's Motion to Dismiss requested the Commission "dismiss the Complaint with prejudice because . . . [Cube] has failed to state a claim upon which relief can be granted." When the Commission issues an order, it is acting in a judicial capacity and "shall render its decisions upon questions of law and of fact in the same manner as a court of record." N.C. Gen. Stat. § 62-60 (2017). However, "[o]rdinarily, the procedure before the Commission is more or less informal, and is not as strict as in superior court, nor is it confined by technical rules[.]" *Utilities Commission v. Area Development, Inc.*, 257 N.C. 560, 569, 126 S.E.2d 325, 332 (1962). In proceedings before the Commission, "[g]reat liberality is indulged in pleadings[,]" and "substance and not form is controlling." *Id.*

Moreover, under the North Carolina Rules of Civil Procedure, a motion to dismiss "tests the legal sufficiency of the complaint. In ruling on the motion the allegations of the complaint must be viewed as admitted, and on that basis the court must determine as a matter of law whether the allegations state a claim for which relief may be granted." *Stanback v. Stanback*, 297 N.C. 181, 185, 254 S.E.2d 611, 615 (1979) (citations omitted). "The function of a motion to dismiss is to test the law of a claim, not the facts which support it. Resolution of evidentiary conflicts is thus not within the scope of the Rule." *White v. White*, 296 N.C. 661, 667, 252 S.E.2d 698, 702 (1979) (citation and quotation marks omitted). A motion to dismiss under Rule 12(b)(6) should not be granted "*unless it appears to a certainty that plaintiff is entitled*

*to no relief under any state of facts which could be proved in support of the claim.*" *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (citation and quotation marks omitted).

## I. NOC Form Requirement

Cube first argues the Commission erred by concluding Cube had not established a Legally Enforceable Obligation. Specifically, Cube asserts "the facts alleged in the Complaint, if proved, are sufficient to establish that [Cube] had substantially complied with all of the prerequisites for establishing a [Legally Enforceable Obligation] prior to 15 November 2016." Essentially, Cube contends the Commission acted "contrary to law" by enforcing the NOC Form requirement. We disagree.

As previously mentioned, PURPA requires electric utilities to purchase power from Qualifying Facilities and directs FERC to enact rules to encourage these purchases. *See N.C. Power*, 338 N.C. at 417, 450 S.E.2d at 899; *see also* 16 U.S.C.A. § 824a-3(a). PURPA also directs state regulatory agencies, such as the Commission, to implement PURPA and FERC regulations. 16 U.S.C.A. § 824a-3(f)(1). The United States Supreme Court has explained a state may comply with this obligation "by issuing regulations, by resolving disputes on a case-by-case basis, or by taking any other action reasonably designed to give effect to FERC's rules." *FERC v. Mississippi*, 456 U.S. at 751, 72 L. Ed. 2d at 542.

Pursuant to its authority under PURPA, FERC established a Qualifying Facility can sell power to a utility via a Legally Enforceable Obligation; however, FERC did not define what constitutes a Legally Enforceable Obligation. *See* 18 C.F.R. § 292.304(d)(2). Rather, whether a Legally Enforceable Obligation has been established is a determination left to state regulatory agencies through their implementation of PURPA. *See, e.g., New PURPA Section 210(m) Regulations Applicable to Small Power Production and Cogeneration Facilities*, 119 FERC ¶ 61,305, at ¶ 128 (June 22, 2007) (codified at 18 C.F.R. pt. 292). In accordance with *FERC v. Mississippi*, the Commission has established several tests for determining the establishment of a Legally Enforceable Obligation. *See* 456 U.S. at 751, 72 L. Ed. 2d at 542 (allowing a state agency to implement PURPA and FERC regulations "by issuing [its own] regulations"); *see also Sub 140 Order*, at \*51-52.

Here, the Commission prescribed its three-part test for determining when a Legally Enforceable Obligation has been established—the developer of the Qualifying Facility is required to: "(1) have self-certified with the FERC as a [Qualifying Facility]; (2) have made a commitment to sell the facility's output to a utility pursuant to PURPA via the use of [the NOC Form;] and (3) have received a CPCN for the construction of the facility." *Sub 140 Order*, at \*52. When it created this test, the Commission provided the following justification for the NOC Form:

> [U]se of a simple form clearly establishing a [Qualifying Facility's] commitment to sell its electric output to a utility to

> establish the notice of commitment to sell prong for creation of [a Legally Enforceable Obligation] would provide clarity both to [Qualifying Facilities] and the Utilities and would, therefore, reduce the number of disputes between the parties and the number of complaints brought before the Commission for adjudication as to when [a Legally Enforceable Obligation] was established.

*Sub 140 Order*, at \*51.

The Commission, as the state regulatory agency tasked with implementing PURPA and FERC regulations, had the authority to create its three-part test for the establishment of a Legally Enforceable Obligation. *See* 16 U.S.C. § 824a-3(a); *see also FERC v. Mississippi*, 456 U.S. at 751, 72 L. Ed. 2d at 542. Further, as the Commission concluded, "use of a simple form . . . to establish the notice of commitment to sell prong for creation of [a Legally Enforceable Obligation] would provide clarity both to [Qualifying Facilities] and the Utilities[,]" and this requirement does not unreasonably interfere with a Qualifying Facility's right to a Legally Enforceable Obligation. *Cf. Grouse Creek Wind Park, LLC*, 142 FERC ¶ 61,187, at \*17 (Mar. 15, 2013) (concluding the Idaho Commission's requirement that a Qualifying Facility file a meritorious complaint to the Idaho Commission before obtaining a Legally Enforceable Obligation "would . . . unreasonably interfere with a [Qualifying Facility's] right to a [Legally Enforceable Obligation]").

Because the Commission acted within its authority in creating this requirement, the Commission did not err in concluding Cube failed to establish a

Legally Enforceable Obligation by not submitting the NOC Form. In its Complaint, Cube admitted it did not submit the NOC Form, arguing instead that it was inapplicable. However, the Commission correctly noted the *Sub 140 Order* "requires all [Qualifying Facilities] to use the [NOC] Form to make a commitment to sell the output of the facility to a utility." Therefore, the Commission did not err in concluding Cube's failure to tender the NOC Form meant that Cube was not entitled to a Legally Enforceable Obligation under a strict application of its three-part test.

## II. Waiver

Cube further contends, however, the Commission erred by determining, at this early stage in the litigation, Cube was not entitled to a *waiver* of the NOC Form requirement. Specifically, Cube argues, "[t]here are several factual issues bearing on the question of waiver that the Majority ignored (or resolved against Cube, contrary to Cube's allegations, at the Rule 12(b)(6) stage) in its summary dismissal." We agree.

As a motion to dismiss "test[s] the law of a claim, not the facts which support it[, r]esolution of evidentiary conflicts is thus not within the scope of the Rule." *White*, 296 N.C. at 667, 252 S.E.2d at 702 (citation and quotation marks omitted). Generally, our courts recognize waiver arguments are usually fact intensive and ill-suited for a motion to dismiss. *Cf. Duncan v. Duncan*, 232 N.C. App. 369, 377, 754 S.E.2d 451, 457 (2014) ("Whether principles of estoppel apply turns on the particular facts of each case." (alteration, citation, and quotation marks omitted)); *Jackson/Hill Aviation,*

*Inc. v. Town of Ocean Isle Beach*, 251 N.C. App. 771, 775-76, 796 S.E.2d 120, 123-24 (2017) (concluding where the plaintiff's complaint asserted waiver and estoppel arguments, the trial court's granting of the defendant's motion to dismiss for failure to state a claim was improper (citations omitted)).

Here, in its Complaint, Cube asserted it was entitled to a waiver of the NOC Form requirement for several reasons. For instance, Cube argued the NOC Form did not apply as Section Three of the Form required a Qualifying Facility to indicate whether it had applied or received a CPCN; however, Cube alleged the CPCN requirement was inapplicable as the Yadkin Project facilities were built well before the statutory enactment of the CPCN requirement. Cube also asserted it had "substantially complied with the substance of the requirement" for establishing a Legally Enforceable Obligation, entitling it to a waiver of the NOC Form requirement. Lastly, Cube alleged facts in its Complaint that it argued showed a lack of good faith on the part of Duke, further supporting its request for a waiver.

In addressing Cube's substantial compliance argument based on the letters sent between the parties in September and October 2016, the Commission concluded these letters "demonstrate[d] the anticipatory nature of [Cube's] position at that time" and that Cube thus did not establish its notice of commitment in October. However, when viewing "the [C]omplaint . . . as admitted," these letters support Cube's assertion that it communicated its commitment to sell to Duke by 11 October

2016. *Stanback*, 297 N.C. at 185, 254 S.E.2d at 615 (citation omitted). In addition, the Order also illustrates the Commission resolved the factual inquiry of whether Duke acted in good faith. However, such a question of fact is ill-suited at this stage in the proceeding. *See White*, 296 N.C. at 667, 252 S.E.2d at 702 ("Resolution of evidentiary conflicts is thus not within the scope of the Rule."); *see also Bledsole v. Johnson*, 357 N.C. 133, 138, 579 S.E.2d 379, 382 (2003) ("Whether a party has acted in good faith is a question of fact for the trier of fact[.]" (citation omitted)). Further, in denying Cube's waiver request, the Commission "weighed equitable considerations, state policy, and considerations of judicial economy in determining whether [Cube] should be granted a waiver of the required use of the [NOC] Form." However, the weighing of such evidence on an undeveloped record at this preliminary motion-to-dismiss stage is improper. *See Jackson/Hill Aviation, Inc.*, 251 N.C. App. at 775-76, 796 S.E.2d at 123-24 (citations omitted).

Moreover, Section 62-79 of our General Statutes requires the Commission, when issuing a final order, to include "[f]indings and conclusions and the reasons or bases therefor upon all the material issues of fact . . . presented in the record[,]" and under Section 62-94, the Commission's findings on material issues of fact must be supported by "competent, material and substantial evidence[.]" N.C. Gen. Stat. §§ 62-79(a)(1); -94(b)(5) (2017). Here, several material issues of fact bearing on whether Cube was entitled to a waiver of the NOC Form requirement—such as whether Duke

acted in bad faith; when Cube committed to sell its energy to Duke; and whether Cube had "substantially complied with the substance" of the Commission's three-part test—were decided by the Commission without the benefit of either party being able to submit additional evidence besides the pleadings. Thus, the Commission's finding that Cube was not entitled to a waiver of the NOC Form requirement could not be supported by "competent, material and substantial evidence[.]" *Id.* § 62-94(b)(5). Therefore, we conclude the Commission erred in dismissing Cube's claim for a waiver of the NOC Form requirement.

## **Conclusion**

Accordingly, for the foregoing reasons, we affirm the Commission's Order in part but reverse the portion of the Commission's Order dismissing Cube's claim for a waiver of the NOC Form requirement, and we remand this matter for further proceedings on the question of whether Cube should be granted a waiver of the NOC Form requirement.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Judges TYSON and INMAN concur.